**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x
                                                              :
In re:                                                        : Chapter 11
                                                              :
      CONSOLIDATED INFRASTRUCTURE          : Case No. 19-_____ (___)
      GROUP, INC.,[1]                        :
                                                              :
              Debtor.           :
------------------------------------------------------------- x

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE DEBTOR TO PAY OR HONOR
PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS AND (B)
AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND TRANSFERS
RELATED TO SUCH CRITICAL VENDORS OBLIGATIONS**

Consolidated Infrastructure Group, Inc., (the "Debtor"), by and through its proposed

undersigned counsel, Richards, Layton & Finger, P.A., hereby submits this motion (the "Motion")

for entry of interim and final orders, (a) authorizing, but not directing, the Debtor to pay

prepetition claims of certain critical vendors up to $150,000 on an interim basis (the "Interim

Cap") prior to the date of the final hearing (the "Final Hearing") on the Motion (the "Interim

Period") and up to $220,000 in the aggregate (inclusive of the Interim Cap) on a final basis,

following the Final Hearing on the Motion (the "Final Cap"), and (b) authorizing and directing

the applicable banks and financial institutions to honor all related checks and electronic payment

requests.  In support of this Motion, the Debtor submits and incorporates by reference the

*Declaration of Michael G. Johnson in Support of Chapter 11 Petition and First Day Pleadings*

---

[1]      The last four digits of the Debtor's federal tax identification number are (6870).  The mailing address for the Debtor is 11620 Arbor Street, Suite 101, Omaha, Nebraska 68144.

(the "<u>First Day Declaration</u>") filed contemporaneously herewith.[2]  In further support of this Motion, the Debtor respectfully states as follows:

<div align="center"><u>**JURISDICTION**</u></div>

1.       This Court has jurisdiction over this case, the Debtor, property of the Debtor's estate and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.       Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtor consents to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.       The statutory bases for the relief requested in this Motion are sections 105(a), 363(b), 364, 503(b), 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rule 9013-1(m).

<div align="center"><u>**BACKGROUND**</u></div>

5.       On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and

---

[2]       Capitalized terms not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

<div align="center">2</div>

1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

6.      Established in 2016 and headquartered in Omaha, Nebraska, CIG provides underground utility locating and damage prevention services to support companies that conduct underground construction and maintenance.  By providing detailed information on what lies beneath the surface, CIG is able to help protect communities from harms that could otherwise occur when parties, such as utility or other companies, dig underground.

7.      Specifically, CIG provides accurate, on-time damage prevention services to ensure its customers' valuable underground assets are protected.  These "811" locating services are tailored to the needs of each customer, and include handling emergency and real time notice locate requests, damage investigations (including testimonial support), extended locates, projects (including extraordinary projects), site surveillance, and route patrol and monitoring.

8.      Additional factual background regarding the Debtor, including its business operations, capital and debt structures, and the events leading to the filing of the chapter 11 case, is set forth in detail in the First Day Declaration, which is fully incorporated in this Motion by reference

A.      **The Critical Vendor Claims**

9.      As described in detail in the First Day Declaration, the Debtor provides underground utility and damage prevention services to others that perform underground construction and maintenance.  The Debtor provides a full spectrum of utility asset damage prevention and locating services to electric, gas, water, sewer, cable, and telecom companies throughout North America.

3

10.     The Debtor's ongoing business is dependent upon its ability to safely provide reliable, effective services to support utility provider and construction customers which, in turn, is dependent upon continuous access to the essential goods and services.  The Debtor believes that the payment of the Critical Vendor Claims (as defined below) is vital to the Debtor's ability to continue to provide its technical services on a timely, dependable basis to its customers without interruption and, thus, to its efforts to preserve and maximize value for all stakeholders during this chapter 11 case.

11.     The Debtor believes that many of its vendors and service providers will continue to do business with it after commencement of this case because doing so simply makes good business sense.  In some cases, however, the Debtor anticipates that certain of the Debtor's vendors that are critical to the Debtor's uninterrupted operations (the "Critical Vendors," which claims will be identified as the "Critical Vendor Claims") will: (a) refuse to deliver goods and services without payment of some or all of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of some or all of their prepetition claims, thereby effectively refusing to do business with the Debtor. Accordingly, the Debtor requests authorization to pay the Critical Vendor Claims of such vendors and service providers in its discretion and subject to the criteria below, because payment of such claims is necessary to the continued and uninterrupted operations of the Debtor preservation of the Debtor's value as a going concern through a sale.

B.      **Stringent Criteria Will Be Used to Identify Critical Vendors.**

12.     To ensure that the Debtor identified as Critical Vendors those vendors and service providers that are actually critical to the Debtor's business, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, provide goods or services if not paid, certain of the Debtor's employees and professionals who are responsible for

4

maintaining, and have intimate knowledge of, the Debtor's vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtor's immediate needs for goods and services.

13.    The Debtor has used, and will continue to use, the following non-exhaustive criteria to determine which of the Debtor's vendors and service providers are Critical Vendors: (i) (a) whether the vendor or service provider is a sole, limited, or high value source provider of goods or services critical to the business operations of the Debtor; (b) whether no or few alternative vendors are available that can provide requisite volumes of similar goods or services on equal or better terms to the Debtor; (c) whether the Debtor could not continue to operate while transitioning business to an alternative vendor or source of supply; (d) whether replacement costs, including pricing, transition expenses and lost sales, exceed the amount of the vendor's outstanding invoices to a significant degree; (e) whether a vendors' prepetition claim is entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; (f) whether an agreement exists by which the Debtor could compel the vendor to perform; or (g) whether specifications (including patented processes or materials), permit or contract requirements prevent, directly or indirectly, the Debtor from obtaining goods and/or services from an alternative vendor or source; *and* (ii) whether failure to pay all or a part of the invoices of a vendor or service provider who meets any of the aforementioned standards in (a) through (g) could result in financial distress for the vendor such that the Debtor's ability to continue operating would be jeopardized.  The Debtor is confident that this process has appropriately

identified, and will continue appropriately to identify, only those vendors and service providers that are critical to the estate.[3]

## C.   Description of Critical Vendors

14.   The Debtor believes that if it fails to pay the Critical Vendor Claims owed to certain of its suppliers and service providers on a timely basis, its existing relationships with such suppliers and service providers will be negatively impacted, resulting in either outright refusal to continue to supply such goods and services postpetition or a willingness to only supply such goods and services at unfavorable prices for the Debtor in the future.

15.   The Debtor's Critical Vendors include vendors from various segments of the utility damage prevention industry, such as certain utility locating ad mapping equipment providers, field technology and hardware suppliers, utility company liaisons, safety equipment providers, and professional training services.  Other Critical Vendors include vendors that, while not unique to the utility damage industry, provide longtime-support and infrastructure which the Debtor relies upon heavily, such as commercial vehicle lease and maintenance services, software development, data-sharing technology and protection, and field equipment storage.  Certain of the Debtor's larger customers require the Debtor's ready presence on-site in undertaking complex construction and infrastructure projects for their own customers on tight timetables.  In order to provide the caliber and reliability of services required, the Debtor needs precise tools, properly trained operators and steady operational support to protect against the risk of service disruption, property damage, and serious personal injury inherent to underground utility work.

---

[3]   The Debtor believes that keeping the identity of potential Critical Vendors confidential may assist them in reducing the number of prepetition claims that it must pay in order to continue receiving critical goods and services. Accordingly, a schedule of Critical Vendors has not been filed with this Motion and will not be made publicly available.  Upon request by (a) the United States Trustee for the District of Delaware (b) the Court; or (c) any official committee appointed in this case, the Debtor will provide, on a confidential basis, a schedule of payments made in accordance with any order entered by the Court approving this Motion.

Losing these critical suppliers would immediately put the Debtor's relationships with its key customers in serious jeopardy.  At a minimum, finding replacement suppliers would disrupt service to allow for the lengthy process of redesigning established procedures and protocols, including a massive training overhaul and testing periods, in turn stalling the Debtor's customer's projects and threatening the Debtor's revenues and relationships with such customers. Ultimately, it is possible that the Debtor's key customers would find an alternative supplier to the detriment of the Debtor and its estate.

16.    For instance, one of the Debtor's underground guiding equipment supplier provides superior underground utility locating equipment used to detect the location of underground utilities without excavation.  In addition, federal law requires the Debtor's employees to participate in utility transmission and distribution training, maintain current operator certifications and adhere to the latest rules and regulations for the industry.  The Debtor has found only one training service that partners with a breadth of approved utility providers and industry experts capable of providing all the training, certification and continuing education necessary for compliance and license to operate in the field.  Even if the Debtor could identify replacement suppliers that might eventually combine to provide commensurate industry-recognized and certified technical training or exclusive technology, if such suppliers exist, it would take significant time to transition.  With the knowledge that the Debtor cannot provide services at all, or reliably without a skilled and certified workforce and the most accurate tools, respectively, a replacement vendor would be able to exert significant leverage over the Debtor in pricing negotiations.  In turn, the Debtor will likely be forced to agree to unfavorable terms that would negatively impact the Debtor's liquidity situation.

RLF1 20729721v.3

17.     Overall, any disruption in the continuous supply of goods and services from these Critical Vendors would jeopardize the Debtor's ability to provide services and increase costs in the short term, resulting in a substantial negative impact on the Debtor's revenues and enterprise value to the detriment of all parties in interest.

18.     Vendors and service providers of the nature described above, and others that satisfy the criteria described above, fall under the rubric of Critical Vendors.  Any refusal by Critical Vendors to provide essential goods or perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtor's business.  For even in those instances in which an actual replacement vendor exists, prior to making a payment on account of the Critical Vendor Claim, the Debtor will have determined that the time and other factors involved in replacing such Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible given the Debtor's efforts to maximize value for its estate and to continue to operate its business in the normal course.  The Debtor estimates that the aggregate amount allocated to the satisfaction of the Critical Vendors Claims account for approximately 10% of the aggregate prepetition trade claims.

**D.     Proposed Terms and Conditions for Payment of Critical Vendor Claims**

19.     The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtor on trade terms that are the same or better than the trade terms that were most favorable in the 12 months prior to the Petition Date (the "Customary Trade Terms").  The Debtor reserves the right to negotiate new trade terms (the "Minimum Credit Terms") with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary from the Customary Trade Terms, to the extent the Debtor determines that such terms are necessary to procure essential goods or services or otherwise in the best interests of the Debtor's estate.

8

20.     To ensure that the Critical Vendors deal with the Debtor on either Customary Trade Terms or Minimum Credit Terms, the Debtor will require execution by a Critical Vendor of a letter agreement (a "Trade Agreement")[4] substantially in the form attached to the proposed final order as Exhibit 1.

21.     The Debtor proposes that each Trade Agreement include, without limitation, the following terms:

(a)     the amount of the relevant Critical Vendor's estimated Critical Vendor Claims, accounting for any setoffs, other credits and discounts thereto; *provided*, *however*, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of this Court;

(b)     the Critical Vendor's agreement to accept payment under the Trade Agreement in full and complete satisfaction of any and all amounts owed to the Critical Vendor by the Debtor for the period ending on the Petition Date;

(c)     the Customary Trade Terms or Minimum Credit Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtor may agree, and the Critical Vendor's agreement to provide goods or services to the Debtor under such terms for the duration of the Chapter 11 Case unless the Debtor fails to make timely payments under the agreed-upon trade terms;

(d)     the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtor, its estate, any of the non-Debtor affiliates, or any other person or entity or any of its respective assets or property (real or personal) any lien (a "Lien"), a claim for reclamation (a "Reclamation Claim") or a claim under section 503(b)(9) of the Bankruptcy Code (a "503(b)(9) Claim"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtor arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, the Critical Vendor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim, unless the Critical Vendor's participation in the program to pay Critical Vendor Claims authorized by the Order is terminated;

---

[4]     The Debtor's entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims.

RLF1 20729721v.3

(e)     the Critical Vendor's agreement not to file a motion to compel assumption or rejection of any contract under which the Critical Vendor Claim arises; and/or

(f)     the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order sought hereby and is bound thereby.

22.     By this Motion, the Debtor seeks only the authority to enter into Trade Agreements when the Debtor determines that payment of such Critical Vendor Claims is necessary to its postpetition operations and that such agreements are advisable.  The Debtor also hereby seeks authority to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtor determines, in its business judgment that failure to pay such Critical Vendor Claims presents a material risk of irreparable harm to the Debtor's business and there is no reasonable likelihood that the Debtor will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.[5]

23.     By agreeing to provide Customary Trade Terms or Minimum Credit Terms under a Trade Agreement, the Critical Vendors are extending unsecured postpetition credit to the Debtor for the benefit of all creditors.  Such Customary Trade Terms or Minimum Credit Terms maintain the credit terms that the Debtor had prior to the Petition Date, or provide other acceptable credit terms, and may provide the Debtor with more favorable terms for unsecured credit than currently provided by the Critical Vendors or available elsewhere.  Accordingly, the treatment of the valid Critical Vendor Claims set forth in this Motion in exchange for Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtor and its estate and should be approved in accordance with section 363(b) of the Bankruptcy Code.

---

[5]     Nothing in this Motion should be construed as a waiver by any of the Debtor of its rights to contest any claim of any Critical Vendor under applicable non-bankruptcy law.

RLF1 20729721v.3

24.      In the event that a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtor on Customary Trade Terms or Minimum Credit Terms following receipt of payment on its Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtor, the Debtor seeks authority to return the parties to the positions they held immediately prior to entry of the Order approving this Motion with respect to all prepetition claims.  Further, the Debtor seeks authority without further order of the Court, (a) to declare that any Trade Agreement between the Debtor and such Critical Vendor is terminated; (b) to declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity; and (c) to recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.  In addition, the Debtor reserves the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

25.      The Debtor further proposes that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtor's notification to the Critical Vendor of such a default; or the Debtor, in its discretion, reach a favorable alternative agreement with the Critical Vendor.

26.      The Debtor will also maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the goods or services provided by such Critical Vendor.

RLF1 20729721v.3

## RELIEF REQUESTED

27.     By this Motion, pursuant to sections 105(a), 363(e), 364, 503(b), 1107(a), and 1108 of the Bankruptcy Code, the Debtor seeks entry of interim and final orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, authorizing, but not directing, the Debtor to pay prepetition claims, not to exceed the Interim Cap and Final Cap, as applicable, of certain of the Debtor's suppliers that are essential to the uninterrupted Debtor's business operations, nonpayment to which, in the Debtor's business judgment, would likely result in those suppliers halting their provision of goods or services to the Debtor.  Such relief, including any and all authorizations or payments requested herein, shall be subject to and implemented in accordance with the provisions of any orders of this Court approving any debtor in possession financing for the Debtor, including any budget in connection therewith.

28.     The payment of Critical Vendor Claims will be conditioned on the agreement of the applicable Critical Vendors (i) to continue supplying goods and/or services to the Debtor on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtor immediately prior to the Petition Date; and (ii) to accept such payment in full and complete satisfaction of such Critical Vendor's Claims. The Debtor reserves the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim. Such relief, including any and all authorizations or payments requested herein, shall be subject to, and implemented in accordance with, the provisions of any orders of this Court approving any debtor in possession financing for the Debtor, including any budget in connection therewith.

29.     The Debtor also requests that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts, and to honor all fund transfer requests made, in respect of payments made to the Critical Vendors, whether such checks were presented, or fund transfer requests submitted,

12

prior to or after the Petition Date, and that such institutions be authorized to rely on the Debtor's representations as to the identification of checks drawn and fund transfer requests made to satisfy its obligations to Critical Vendors.

### BASES FOR RELIEF REQUESTED

30.     The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances.  Courts have recognized each of these statutory provisions as valid authority for such payments.

**A.      This Court May Authorize Payment of the Critical Vendor Claims Under Sections 363 and 364 of the Bankruptcy Code.**

31.     Courts in this and other districts consistently authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  In authorizing such payments, those courts generally rely on legal theories rooted in sections 363 and 364 of the Bankruptcy Code.  Specifically, section 363(b)(1) of the Bankruptcy Code authorizes the debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1).  *See, e.g.*, *In re MPC Computers, LLC*, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to section 363, the payment of prepetition claims of some suppliers); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (affirming bankruptcy court's decision under section 363 authorizing contractor to pay prepetition claims of some suppliers who were potential lien claimants).  Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor has a sound business purpose for doing so.  *See e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (recognizing that courts routinely grant orders allowing payment to essential suppliers in

order to preserve and maximize the debtors' estates); s*ee also Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *United States Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."); *See Computer Sales Int'l. Inc. v. Fed. Mogul Global, Inc.* (*In re Fed. Mogul Global, Inc.*), 293 B.R. 124, 126 (Bankr. D. Del. 2003) (citing *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996)) (holding that in terminating an executory contract in favor of entering into a new contract with a different vendor, the debtor was not required to show "severe hardship or burden," but rather only "a sound business justification for the proposed transaction").

32.     Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *In re ALH Holdings LLC*, 675 F. Supp.2d 462, 477 (D. Del. 2009) ("[A] court will not disturb the business decisions of loyal and informed directors 'if they can be attributed to any rational business purpose.'") (citing *Sinclair Oil Corp. v. Levien*, 280 A. 2d 717, 720 (Del. 1971)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'"); *Official*

14

*Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) *overruled in part by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009)).

33.     Additionally, where, as here, the relief at issue involves a request impacting the trade terms among the Debtor and the vendor, the relief may, where the appropriate showing has been made, be approved pursuant to section 364 of the Bankruptcy Code. *See In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (holding that, "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

34.     In the instant case, the Debtor assumed obtaining trade terms from its Critical Vendors in the development of its budget.  Further, it is the Debtor's business judgment that the failure to pay the Critical Vendor Claims would have a material adverse impact on the day-to-day operations of its business, thereby prejudicing the Debtor's estate and all parties in interest. Indeed, failure to pay the Critical Vendor Claims would very likely significantly disrupt the Debtor's ability to provide timely, safe services by inhibiting the Debtor's access to the goods and services it needs the most.  If certain Critical Vendors are unwilling to provide their goods postpetition because of their outstanding prepetition claims, the Debtor's operations would suffer dramatically, compromising the value of the Debtor's estate to the detriment of all creditors. Further, the relief requested in this Motion contemplates payments to be made to Critical

Vendors that agree to provide goods or services on Customary Trade Terms or Minimum Credit Terms, to the extent possible.  As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code.  As detailed above, the goods and services provided by the Critical Vendors are vital to the Debtor's continuing business operations.

**B.     The Court May Rely on the "Necessity of Payment" Doctrine and Its General Equitable Powers to Grant the Relief Sought in the Motion.**

35.     The Court may authorize payment of prepetition claims to Critical Vendor under section 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Under section 105 of the Bankruptcy Code, this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  For the reasons set forth above, and in light of the need for the Debtor to preserve the going concern value of its business, the relief requested in this Motion is proper and should be granted.  *See Czyewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts are authorized to approve orders allowing payment of prepetition claims, which is necessary for the debtors to have a successful reorganization).

36.     The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the chapter 11 case where the payment of such claims is necessary to the continued operations of a debtor's business and restructuring efforts.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[6] *In re Columbia Gas Sys., Inc.*, 171 B.R. 189,

---

[6]     The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to

*(cont'd)*

191-192 (Bankr. D. Del. 1994) (noting that debtors may pay pre-petition claims that are essential to continued operation of business) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d at 581).   The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence.   *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (recognizing that the doctrine of necessity is derived from the court's equitable powers and allows debtors to make payment on prepetition claims to creditors who will refuse to supply services or material essential to the conduct of the debtors' business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Id.* at 175-176.

37.     The Debtor has narrowly tailored the definition of Critical Vendors to include only those (virtually irreplaceable and entrenched) suppliers who provide goods and services that are essential to preserve the value of the Debtor's business as a going concern and nonpayment to which, in the Debtor's business judgment, would very likely result in those suppliers halting their provision of goods or services to the Debtor.   In turn, the maintenance of the Debtor's business during these chapter 11 case is crucial to the Debtor's ability to preserve going concern

---

carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport, C. & S.W. R. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See id.* at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger.*  *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

status, thus providing enhanced value for the benefit of all of the Debtor's stakeholders.  Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

### C.    The Court Should Authorize Payment of the Critical Vendor Claims As a Valid Exercise of the Debtor's Fiduciary Duties

38.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor, operating its business as a debtor in possession is a fiduciary "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

39.    The *CoServ* court has noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "by the preplan satisfaction of a prepetition claim."  *Id.* That court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

40.    Payment of the Critical Vendor Claims meets each element of the *CoServ* court's standard.  As described above, the Debtor has narrowly tailored the Critical Vendor Claims to

18

encompass only those vendors and service providers that satisfy the specific criteria described above and that refuse to, demand pricing or trade terms that constitute an effective refusal to, provide goods or services to the Debtor on a postpetition basis if their prepetition balances are not paid.   Even a brief respite from providing services on-site would stagnate the Debtor's operations and cost the Debtor's estate substantial lost revenues, which would severely impact the value of the Debtor's business.   The potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is grossly disproportionate to the amount of any prepetition claim that may be paid.   Finally, prior to making a payment on account of a Critical Vendor Claim, the Debtor will have examined other options short of payment of Critical Vendor Claims and will have determined that, to avoid significant disruption of the Debtor's business operations, there exists no practical or legal alternative to payment of the Critical Vendor Claims.   Therefore, the Debtor believes that paying the Critical Vendor Claims will allow it to discharge its fiduciary duties as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

**D.     Payment of Certain of the Critical Vendor Claims Is Justified Under Sections 506(b) and 1129(b)(2) of the Bankruptcy Code.**

41.     The Debtor believes that its failure to pay certain of the Critical Vendor Claims may result in the assertion of possessory liens by such Critical Vendors under applicable state law with respect to any goods in their possession (collectively, the "Liens").   Moreover, to protect any asserted Lien rights, the Critical Vendors may refuse to release goods or property in their possession unless and until their prepetition claims have been satisfied.   Therefore, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, many of these parties may be entitled to assert and perfect Liens against the Debtor's  property, which would entitle them to payment ahead of other general unsecured creditors in any event, and may

19

hold the property subject to the asserted Liens pending payment, to the direct detriment of the Debtor and its estate.

42. Moreover, since the amount of these Critical Vendor Claims is likely less than the value of any property securing those claims, any such party holding a Lien arguably is a fully secured creditor. For those Critical Vendor Claims that are deemed secured claims, section 1129(b)(2)(A) of the Bankruptcy Code requires that they be satisfied through deferred cash payments totaling at least the allowed amount of each such claim, of a value as of the effective date of the plan equal to the value of the collateral securing the claim, with a continuation of the Liens against the collateral; or if the collateral is to be sold, that the Lien securing the claim attach to the proceeds of sale; or that the holder realize the indubitable equivalent of the claim. 11 U.S.C. § 1129 (b)(2)(A). Additionally, under section 506(b) of the Bankruptcy Code, fully secured creditors are entitled to receive postpetition interest accruing on their claims to the extent that such claims are over secured. Consequently, satisfaction of the Critical Vendor Claims that are subject to valid Liens should give the Critical Vendors no more than to what they otherwise would be entitled under a plan, saving the Debtor the interest costs that otherwise would likely accrue on the Critical Vendor Claims during this chapter 11 case.

**E. Payment of Certain Critical Vendor Claims Is also Appropriate Pursuant to Section 503(b)(9) of the Bankruptcy Code.**

43. Certain of the Critical Vendors may have prepetition claims for goods delivered to and received by the Debtor within twenty (20) days before the Petition Date, *i.e.*, a 503(b)(9) Claim. Pursuant to section 503(b)(9) of the Bankruptcy Code, any claims arising from the sale of such goods will be administrative expenses at the end of this chapter 11 case. *See* 11 U.S.C. § 503(b)(9); *see also In re World Imports, Ltd.*, 862 F.3d 338, 346 (3d Cir. 2017) (suppliers

entitled to administrative expenses for goods that came into the debtors' physical possession within 20 days before the bankruptcy filing).

44.    Additionally, bankruptcy courts have held that the timing of the payment of administrative expenses allowed pursuant to 503(b)(9) is within the discretion of the bankruptcy court.  *See, e.g., In re Tubular Techs., LLC*, 372 B.R. 820, 824 & n.4 (Bankr. D.S.C. 2007) (bankruptcy court may determine when section 503(b)(9) claim is paid); *In re Bookbinders' Rest., Inc.*, 2006 WL 3858020, at *3-4 (Bankr. E.D. Pa. Dec. 28, 2006) (timing of the payment of Bankruptcy Code Section 503(b)(9) claim "is within the discretion of the bankruptcy court"); *see also In re Global Home Prods., LLC*, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (providing that "when a claimant timely files a request for payment of an administrative expense under §503(a), the timing of the payment of that administrative expense claim is left to the discretion of the Court.")

45.    Accordingly, to the extent that the Critical Vendor Claims are 503(b)(9) Claims, the Debtor submits that section 503(b)(9) of the Bankruptcy Code provides an additional basis to pay such claims.

## THE COURT SHOULD AUTHORIZE APPLICABLE FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

46.    The Debtor also requests that all applicable banks and other financial institutions (the "Banks") be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtor related to the claims that the Debtor requests authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, and (b) rely on the Debtor's designation of any particular check as approved by this Court's order.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

47.      The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the payments proposed in this Motion are essential to prevent potentially irreparable damage to the Debtor's  operations, value, and ability to sell its business as a going conern.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## INTERIM APPROVAL SHOULD BE GRANTED
## AND A FINAL HEARING SHOULD BE SCHEDULED

48.      The Debtor requests that the Court conduct a preliminary hearing on the Motion and, on an interim basis, grant the relief requested in this Motion.  In addition, the Debtor respectfully requests that the Court schedule a final hearing on this Motion at the Court's convenience following entry of an interim order.  Such relief is necessary in order to maintain and preserve the ongoing operations of the Debtor.

## RESERVATION OF RIGHTS

49.      Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtor expressly reserves its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.  Likewise, if this Court grants the relief sought in this Motion, any payment made pursuant to the Court's order is not intended

and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## NOTICE

50.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware (Attn: Linda Richenderfer, Esq.); (ii) the United States Attorney for the District of Delaware; (iii) the parties on the Debtor's list of twenty (20) largest creditors; (iv) the DIP Lenders; (v) DLA Piper LLP (US), as counsel to the DIP Lenders; (vi) the Internal Revenue Service; (vii) the Banks, and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties as required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtor respectfully submits that no further notice of this Motion is required.

## NO PRIOR REQUEST

48.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtor respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms annexed hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:   January 30, 2019          Respectfully submitted,
   Wilmington, Delaware

         **RICHARDS, LAYTON & FINGER, P.A.**

         By: */s/ Daniel J. DeFranceschi*
           Daniel J. DeFranceschi (DE 2732)
           Russell C. Silberglied (DE 3462)
           Paul N. Heath (DE 3704)
           Zachary I. Shapiro (DE 5103)
           One Rodney Square
           920 N. King Street
           Wilmington, Delaware 19801
           Telephone: (302) 651-7700
           Facsimile: (302) 651-7701
           Email:  defranceschi@rlf.com
               silberglied@rlf.com
               heath@rlf.com
               shapiro@rlf.com

         *Proposed Counsel to the Debtor and Debtor in Possession*

**<u>EXHIBIT A</u>**

**(Proposed Interim Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
     CONSOLIDATED INFRASTRUCTURE              :   Case No. 19-_____ (___)
     GROUP, INC.,¹                            :
                                              :
                 Debtor.                      :   Re: D.I. No. ___
-------------------------------------------------------------x
```

**INTERIM ORDER AUTHORIZING THE DEBTOR TO PAY OR HONOR**
**PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS**

This matter coming before the Court on the *Motion of the Debtor for Entry of Interim and*

*Final Orders (A) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain*

*Critical Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related*

*to Such Critical Vendor Obligations* (the "Motion"),² filed by the above-captioned debtor (the

"Debtor"), for entry of an interim order, pursuant to sections 105(a), 363(e), 364, 503(b), 507(a),

1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h), (a)

authorizing, but not directing, the Debtor to pay prepetition claims of certain critical vendors up

to $150,000 (the "Interim Cap") prior to the date of the final hearing (the "Final Hearing") on the

Motion (the "Interim Period") and up to $220,000 in the aggregate as of the Final Hearing (the

"Final Cap"), (b) authorizing and directing the applicable banks and financial institutions to

honor all related checks and electronic payment requests, and (c) granting related relief; all as

further described in the Motion; the Court having found that (i) the Court has jurisdiction over

---

¹       The last four digits of the Debtor's federal tax identification number are (6870).  The mailing address for
the Debtor is 11620 Arbor Street, Suite 101, Omaha, Nebraska 68144.

²       Capitalized terms not otherwise defined in this Interim Order shall have the meanings ascribed to such
terms in the Motion.

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion being adequate and appropriate under the particular circumstances; the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at the hearing; after due deliberation, and good and sufficient cause having been shown,

**IT IS HEREBY ORDERED that:**

1.      The Motion is GRANTED on an interim basis as set forth in this Interim Order.

2.      The Debtor is authorized, but not directed in the reasonable exercise of its business judgment, to pay all or a portion of the Critical Vendor Claims, subject to the terms and conditions set forth in this Interim Order, in an amount not to exceed $150,000 in the aggregate on an interim basis, unless otherwise ordered by the Court.

3.      After the date hereof, the Debtor shall determine who is a Critical Vendor by considering, among other things, whether failure to pay such creditor's prepetition claims will have a material impact on the Debtor's operations.

4.      The Debtor is authorized, but not directed, to negotiate the supply of goods or services to the Debtor from the Critical Vendors on trade terms that are the same or better than the trade terms that were most favorable in the twelve (12) months prior to the Petition Date (the "Customary Trade Terms").  The Debtor is further authorized to negotiate new trade terms (the "Minimum Credit Terms") with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary from the Customary Trade Terms, to the extent the Debtor determines,

2

in its business judgment, that such terms are necessary to procure essential goods or services or otherwise in the best interests of the Debtor's estate.

5.    To ensure that the Critical Vendors deal with the Debtor on either Customary Trade Terms or Minimum Credit Terms, the Debtor is authorized, but not directed, to undertake appropriate efforts to cause Critical Vendors to enter into Trade Agreements with the Debtor substantially in the form of the agreement that is annexed to this Interim Order as <u>Exhibit 1</u>, as a condition of payment of its Critical Vendor Claims.

6.    Except as set forth in this Interim Order, the Debtor is authorized to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtor determines, in its business judgment, that failure to pay such Critical Vendor Claims presents a material risk of irreparable harm to the Debtor's business and there is no reasonable likelihood that the Debtor will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

7.    As a further condition of receiving payment on a Critical Vendor Claim, the Debtor is authorized, in its discretion, to require that such Critical Vendor agree to take whatever action is necessary to remove any trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Critical Vendor Claim.

8.    If a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtor on Customary Trade Terms or Minimum Credit Terms following receipt of payment on its Critical Vendor Claim or otherwise fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtor, then the Debtor may (a) declare that any Trade Agreement is immediately terminated without further order of this Court and return the parties to the positions they held immediately prior to entry of this Interim Order with respect

3

to all prepetition claims including, but not limited to, seeking recovery or disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceeded the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense, and (b) declare that payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of this Court or action by any person or entity.  Nothing in this Interim Order shall constitute a waiver of the Debtor's rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

9.       Notwithstanding the foregoing, the Debtor may, in its discretion reinstate a Trade Agreement if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtor's notification to the Critical Vendor of such default had occurred; or the Debtor, in its discretion, reach a favorable alternative agreement with the Critical Vendor.

10.      The Debtor shall maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the goods or services provided by such Critical Vendor.  Such matrix shall be provided, upon request, to (x) the Office of the United States Trustee for the District of Delaware, (y) counsel and financial advisor to the DIP Lenders, and (z) counsel for any official committee of unsecured creditors appointed in the Debtor's chapter 11 case; provided that, pursuant to sections 107(b) and 107(c)(3)(B) of the Bankruptcy Code, the foregoing parties (including the DIP Lenders) shall keep the vendor matrix confidential and shall not disclose any of the information contained in the

4

vendor matrix to any party without the prior written consent of the Debtor or an order of this Court.

11.     Nothing in this Interim Order shall be construed to limit, or in any way affect, the Debtor's ability to dispute any Critical Vendor Claim.

12.     Nothing in the Motion or this Interim Order, or the Debtor's payment of any claims pursuant to this Interim Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or lien against the Debtor or its estate; (b) a waiver of the Debtor's right to dispute any claim or lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a modification of the Debtor's rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

13.     The amount of each Critical Vendor's Critical Vendor Claims set forth in connection with a Trade Agreement shall be used only for purposes of determining such Critical Vendor's claim under this Interim Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Interim Order shall not excuse such Critical Vendor from filing a proof of claim in this case.

14.     Nothing contained in this Interim Order shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtor and a Critical Vendor.  Notwithstanding the relief granted in this Interim

Order and any actions taken hereunder, nothing in this Interim Order shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by any person.

15.    The authorization granted hereby to pay Critical Vendor Claims shall not create any obligation on the part of the Debtor or its officers, directors, attorneys or agents to pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtor not to pay a Critical Vendor Claim, and nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

16.    The Debtor's banks and financial institutions shall be and hereby are authorized and directed to receive, process, honor and pay all checks and fund transfers on account of the Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtor's banks and other financial institutions are authorized to rely on the representations of the Debtor as to which checks and fund transfers are authorized to be honored and paid pursuant to this Interim Order.

17.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Interim Order or any payment made pursuant to this Interim Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity or priority of any claim or lien against the Debtor, (b) a waiver of the Debtor's rights to subsequently dispute such claim or lien, (c) an undertaking, obligation, or commitment to pay any claims hereunder, or (d) the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

RLF1 20729721v.3

18.     Any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently, nor should it be construed as consent to the amount of any claim by a Critical Vendor.   The Debtor retains the sole discretion whether to pay any claim that the Court authorizes under this proposed Interim Order.

19.     The final hearing (the "Final Hearing") on the Motion shall be held on _____ __, 2019 at ___:___ __.m. (prevailing Eastern Time).  Any objections or responses to entry of a final order on the Motion (each, an "Objection") shall be filed on or before 4:00 p.m. prevailing Eastern Time on _____ __, 2019, and served on the following parties via first class and electronic mail, as applicable:  (i) the Debtor, Consolidated Infrastructure Group, Inc., 11620 Arbor Street, Suite 101, Omaha, Nebraska 68144 (Attn: Mike Johnson); (ii) proposed counsel to the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn:  Daniel J. DeFranceschi, Esq. [defranceschi@rlf.com]); (iii) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801 (Attn:  Linda Richenderfer,  Esq.  [linda.richenderfer@usdoj.gov);  (iv)  counsel  to  any  statutory  committee appointed in this chapter 11 case; and (v) counsel for the DIP Lenders, DLA Piper LLP (US), 444 W. Lake Street, Suite 900, Chicago, Illinois 60606 (Attn: Richard A. Chesley, Esq. [richard.chesley@dlapiper.com] and Jamila Justine Willis, Esq. [jamila.willis@dlapiper.com]), and DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn:  R.  Craig  Martin,  Esq.  [craig.martin@dlapiper.com]  and  Maris  Kandestin,  Esq. [maris.kandestin@dlapiper.com]).  In the event no objections to entry of a final order on the

Motion are timely received, this Court may enter such final order without need for the Final Hearing.

20.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Interim Order is necessary to avoid immediate and irreparable harm to the Debtor's estate.

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

22.     The Debtor is hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Interim Order.

23.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Interim Order.

Dated: _____, 2019
       Wilmington, DE

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 20729721v.3

**<u>Exhibit 1</u>**

**(Proposed Trade Agreement)**

_____, 2019

TO:    [Critical Vendor]
       [Name]
       [Address]

## **Trade Agreement**

As you may be aware, January 30, 2019 (the "Petition Date"), Consolidated Infrastructure Group, Inc., (the "Debtor"), filed  a voluntary petition commencing a bankruptcy case (the "Bankruptcy Case") under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  On the Petition Date, we requested the Bankruptcy Court's authority to pay certain vendors and service providers in recognition of the importance of our relationship with such vendors and service providers.  On _____, 2019, the Bankruptcy Court entered an order (the "Order") authorizing us, under certain conditions, to pay pre-bankruptcy claims of certain vendors and service providers that agree to be bound by the terms of the Order and to the terms set forth below.  A copy of the Order is enclosed.

To receive payment on pre-bankruptcy claims, we require you to agree to supply goods and/or services to the Debtor based on "Customary Trade Terms."  Customary Trade Terms are trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date.

For purposes of administration of this trade program as authorized by the Bankruptcy Court (the "Trade Payment Program"), the Debtor and you agree as follows:

1.    For purposes of this Trade Agreement, the estimated balance of your prepetition claim (accounting for any setoffs, credits or discounts) (the "Prepetition Claim") is $_____.    The Prepetition Claim will be paid as follows:    **[_____].**  Notwithstanding our agreement to pay the Prepetition Claim, it will be necessary for you to file a proof of claim in the Bankruptcy Case to officially evidence the Prepetition Claim.  You will receive notice of the bar date for **filing a proof of claim** at a later date.  You hereby agree to accept payment in the amount of the Prepetition Claim in full and complete satisfaction of any and all amounts owed to you by the Debtor for the period ending on the Petition Date, and you hereby waive any right to assert or seek payment of any amount for the period prior to the Petition Date that exceeds the Prepetition Claim.  In particular, you agree that your proof of claim will not be filed in an amount that exceeds the Prepetition Claim.

2.    The open trade balance or credit line that you will extend to the Debtor for delivery of postpetition goods or performance of postpetition services is $_____ (which shall not be less than the greater of the open trade balance outstanding:  (a) on _____, 2019, or (b) on normal and customary terms on an historical basis for the period prior to the Petition Date.

3.      In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtor, its estate or any other person or entity or any of its respective assets or property (real or personal) any lien (a "Lien"), a claim for reclamation (a "<u>Reclamation Claim</u>"), or a claim under section 503(b)(9) of the Bankruptcy Code (a "<u>503(b)(9) Claim</u>"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtor arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, or 503(b)(9) Claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim unless your participation in the Trade Payment Program authorized by the Order is terminated.

4.      If your Prepetition Claim arises under a contract with the Debtor, you also agree not to file a motion to compel assumption or rejection of the contract.

Payment of your Prepetition Claim in the manner set forth in the Order may occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtor.  Your execution of this letter agreement and the return of the same to the Debtor constitute an agreement by you and the Debtor:

(a)      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Prepetition Claim set forth above;

(b)      that, for at least during the pendency of the Bankruptcy Case, you will continue to supply the Debtor with goods and/or services under the Customary Trade Terms and any terms set forth herein and that the Debtor will pay for such goods and/or services in accordance with the terms hereof;

(c)      that you have reviewed the terms and provisions of the Order and acknowledge that you are bound by such terms; and

(d)      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Prepetition Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtor any payments made to you on account of your Prepetition Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense.

The Debtor and you also hereby agree that any dispute with respect to this agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

2

Please indicate your agreement to the terms hereof by returning a signed copy of this letter to [Name] at (___)_____ or [Name] (___)_____.

Sincerely,


[Debtor]
By:
Its:

Agreed and Accepted by:
[Name of Critical Vendor/Service Provider]
By:
Its:
Dated:

3

**<u>EXHIBIT B</u>**

**(Proposed Final Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                                :   Chapter 11

In re:                                     :

                                        :   Case No. 19-_____ (___)

       CONSOLIDATED INFRASTRUCTURE   :
       GROUP, INC.,[1]                    :

                                        :   **Re: D.I. Nos.___&___**

                     Debtor.              :
---------------------------------------------------------------- x

**FINAL ORDER AUTHORIZING DEBTOR TO PAY OR HONOR PREPETITION**
**OBLIGATIONS TO CERTAIN CRITICAL VENDORS**

This matter coming before the Court on the *Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendor Obligations* (the "Motion"),[2] filed by the above-captioned debtor (the "Debtor"), for entry of interim and final orders, pursuant to sections 105(a), 363(e), 364, 503(b), 507(a), 1107(a), and, 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h), (a) authorizing, but not directing, the Debtor to pay prepetition claims of certain critical vendors up to $150,000 (the "Interim Cap") prior to the date of the final hearing (the "Final Hearing") on the Motion (the "Interim Period") and up to $220,000 in the aggregate as of the Final Hearing (the "Final Cap"), (b) authorizing and directing the applicable banks and financial institutions to honor all related checks and electronic payment requests, and (c) granting related relief, all as further described in the Motion; the Court having found that (i) the Court has jurisdiction over

---

[1]     The last four digits of the Debtor's federal tax identification number are (6870). The mailing address for the Debtor is 11620 Arbor Street, Suite 101, Omaha, Nebraska 68144.

[2]     Capitalized terms not otherwise defined in this Final Order shall have the meanings ascribed to such terms in the Motion.

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion being adequate and appropriate under the particular circumstances, and no other or further notice need to be provided; the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at the interim hearing; and the Court having granted the interim relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted in this Final Order; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED that:**

1.      The Motion is GRANTED on a final basis as set forth in this Final Order.

2.      The Debtor is authorized, but not directed, in its discretion and in the reasonable exercise of its business judgment, to pay all or a portion of the Critical Vendor Claims, subject to the terms and conditions set forth in this Final Order, in an amount not to exceed $220,000 in the aggregate on a final basis, unless otherwise ordered by the Court.

3.      After the date hereof, the Debtor shall determine who is a Critical Vendor by considering, among other things, whether failure to pay such creditor's prepetition claims will have a material impact on the Debtor's operations.

4.       The Debtor is authorized, but not directed, to negotiate the supply of goods or services to the Debtor from the Critical Vendors on trade terms that are the same or better than the trade terms that were most favorable in the twelve (12) months prior to the Petition Date (the "Customary Trade Terms").  The Debtor is further authorized to negotiate new trade terms (the "Minimum Credit Terms") with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary from the Customary Trade Terms, to the extent the Debtor determines, in its business judgment, that such terms are necessary to procure essential goods or services or otherwise in the best interests of the Debtor's estate.

5.       To ensure that the Critical Vendors deal with the Debtor on either Customary Trade Terms or Minimum Credit Terms, the Debtor is authorized, but not directed, to undertake appropriate efforts to cause Critical Vendors to enter into Trade Agreements with the Debtor substantially in the form of the agreement that is annexed to this Final Order as Exhibit 1, as a condition of payment of its Critical Vendor Claims.

6.       Except as set forth in this Final Order, the Debtor is authorized to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtor determines, in its business judgment, that failure to pay such Critical Vendor Claims presents a material risk of irreparable harm to the Debtor's business and there is no reasonable likelihood that the Debtor will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

7.       As a further condition of receiving payment on a Critical Vendor Claim, the Debtor is authorized, in its discretion, to require that such Critical Vendor agree to take whatever action is necessary to remove any trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Critical Vendor Claim.

RLF1 20729721v.3

8.      If a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtor on Customary Trade Terms or Minimum Credit Terms following receipt of payment on its Critical Vendor Claim or otherwise fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtor, then the Debtor may (a) declare that any Trade Agreement is immediately terminated without further order of this Court and return the parties to the positions they held immediately prior to entry of this Final Order with respect to all prepetition claims including, but not limited to, seeking recovery or disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceeded the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense, and (b) declare that payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of this Court or action by any person or entity.  Nothing in this Final Order shall constitute a waiver of the Debtor's rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

9.      Notwithstanding the foregoing, the Debtor may reinstate a Trade Agreement if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtor's notification to the Critical Vendor of such default had occurred; or the Debtor, in its discretion, reach a favorable alternative agreement with the Critical Vendor.

10.      The Debtor shall maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the goods or services provided by such Critical Vendor.  Such matrix shall be provided, upon request, to (x)

4

the Office of the United States Trustee for the District of Delaware, (y) counsel and financial advisor to the DIP Lenders, and (z) counsel for any official committee of unsecured creditors appointed in the Debtor's chapter 11 case; provided that, pursuant to sections 107(b) and 107(c)(3)(B) of the Bankruptcy Code, the foregoing parties (including the DIP Lenders) shall keep the vendor matrix confidential and shall not disclose any of the information contained in the vendor matrix to any party without the prior written consent of the Debtor or an order of this Court.

11.     Nothing in this Final Order shall be construed to limit, or in any way affect, the Debtor's ability to dispute any Critical Vendor Claim.

12.     Nothing in the Motion or this Final Order, or the Debtor's payment of any claims pursuant to this Final Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or lien against the Debtor or its estate; (b) a waiver of the Debtor's right to dispute any claim or lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a modification of the Debtor's rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

13.     The amount of each Critical Vendor's Critical Vendor Claims set forth in connection with a Trade Agreement shall be used only for purposes of determining such Critical Vendor's claim under this Final Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Final Order shall not excuse such Critical Vendor from filing a proof of claim in this case.

14.      No claimant who receives payment on account of a Critical Vendor Claim (whether or not such claimant signs a Trade Agreement) is permitted to file or perfect a Lien on account of such claim, and any such claimant shall take all necessary action to remove any existing Lien relating to such claim, even if the Lien is against property of a non-Debtor. Additionally, no claimant who receives payment on account of a Critical Vendor Claim (whether or not such claimant signs a Trade Agreement) is permitted to file a claim for reclamation or a claim under section 503(b)(9) of the Bankruptcy Code, regardless of the statute or other legal authority upon which such claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtor.

15.      Nothing contained in this Final Order shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtor and a Critical Vendor.  Notwithstanding the relief granted in this Final Order and any actions taken hereunder, nothing in this Final Order shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by any person.

16.      The authorization granted hereby to pay Critical Vendor Claims shall not create any obligation on the part of the Debtor or its officers, directors, attorneys or agents to pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtor not to pay a Critical Vendor Claim, and nothing contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

17.      The Debtor's banks and financial institutions shall be and hereby are authorized and directed to receive, process, honor and pay all checks and fund transfers on account of the Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that

sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtor's banks and other financial institutions are authorized to rely on the representations of the Debtor as to which checks and fund transfers are authorized to be honored and paid pursuant to this Final Order.

18.     Any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently, nor should it be construed as consent to the amount of any claim by a Critical Vendor.   The Debtor retains the sole discretion whether to pay any claim that the Court authorizes under this proposed Final Order.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

20.     The Debtor is hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Final Order.

21.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Final Order.

Dated: _____, 2019
        Wilmington, DE

_____
UNITED STATES BANKRUPTCY JUDGE

7

# **EXHIBIT 1**

**(Proposed Trade Agreement)**

_____, 2019

TO:   [Critical Vendor]
      [Name]
      [Address]

### Trade Agreement

As you may be aware, January 30, 2019 (the "Petition Date"), Consolidated Infrastructure Group, Inc., (the "Debtor"), filed a voluntary petition commencing a bankruptcy case (the "Bankruptcy Case") under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On the Petition Date, we requested the Bankruptcy Court's authority to pay certain vendors and service providers in recognition of the importance of our relationship with such vendors and service providers. On _____, 2019, the Bankruptcy Court entered an order (the "Order") authorizing us, under certain conditions, to pay pre-bankruptcy claims of certain vendors and service providers that agree to be bound by the terms of the Order and to the terms set forth below. A copy of the Order is enclosed.

To receive payment on pre-bankruptcy claims, we require you to agree to supply goods and/or services to the Debtor based on "Customary Trade Terms." Customary Trade Terms are trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date.

For purposes of administration of this trade program as authorized by the Bankruptcy Court (the "Trade Payment Program"), the Debtor and you agree as follows:

5.   For purposes of this Trade Agreement, the estimated balance of your prepetition claim (accounting for any setoffs, credits or discounts) (the "Prepetition Claim") is $_____. The Prepetition Claim will be paid as follows: **[_____].** Notwithstanding our agreement to pay the Prepetition Claim, it will be necessary for you to file a proof of claim in the Bankruptcy Case to officially evidence the Prepetition Claim. You will receive notice of the bar date for **filing a proof of claim** at a later date. You hereby agree to accept payment in the amount of the Prepetition Claim in full and complete satisfaction of any and all amounts owed to you by the Debtor for the period ending on the Petition Date, and you hereby waive any right to assert or seek payment of any amount for the period prior to the Petition Date that exceeds the Prepetition Claim. In particular, you agree that your proof of claim will not be filed in an amount that exceeds the Prepetition Claim.

6.   The open trade balance or credit line that you will extend to the Debtor for delivery of postpetition goods or performance of postpetition services is $_____ (which shall not be less than the greater of the open trade balance outstanding: (a) on _____, 2019, or (b) on normal and customary terms on an historical basis for the period prior to the Petition Date.

7.      In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtor, its estate or any other person or entity or any of its respective assets or property (real or personal) any lien (a "Lien"), a claim for reclamation (a "<u>Reclamation Claim</u>"), or a claim under section 503(b)(9) of the Bankruptcy Code (a "<u>503(b)(9) Claim</u>"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtor arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, or 503(b)(9) Claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim unless your participation in the Trade Payment Program authorized by the Order is terminated.

8.      If your Prepetition Claim arises under a contract with the Debtor, you also agree not to file a motion to compel assumption or rejection of the contract.

Payment of your Prepetition Claim in the manner set forth in the Order may occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtor.  Your execution of this letter agreement and the return of the same to the Debtor constitute an agreement by you and the Debtor:

(e)      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Prepetition Claim set forth above;

(f)      that, for at least during the pendency of the Bankruptcy Case, you will continue to supply the Debtor with goods and/or services under the Customary Trade Terms and any terms set forth herein and that the Debtor will pay for such goods and/or services in accordance with the terms hereof;

(g)      that you have reviewed the terms and provisions of the Order and acknowledge that you are bound by such terms; and

(h)      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Prepetition Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtor any payments made to you on account of your Prepetition Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense.

The Debtor and you also hereby agree that any dispute with respect to this agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

RLF1 20729721v.3

Please indicate your agreement to the terms hereof by returning a signed copy of this letter to [Name] at (___)_____ or [Name] (___)_____.

Sincerely,


[Debtor]
By:
Its:

Agreed and Accepted by:
[Name of Critical Vendor/Service Provider]
By:
Its:
Dated: