**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
                                  :

In re:                            :   Chapter 11
                                  :

CONSOLIDATED INFRASTRUCTURE GROUP,   :   Case No. 19-_____ (___)
INC.,[1]                            :
                                  :

            Debtor           :
---------------------------------------------------------------x

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS**
**AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED**
**FINANCING, MODIFYING THE AUTOMATIC STAY**
**AND GRANTING RELATED RELIEF**

Consolidated Infrastructure Group, Inc. (the "Debtor"), by and through its proposed counsel, Richards, Layton & Finger, P.A., hereby submits this motion (the "Motion"), pursuant to sections 105(a), 362, and 364(c)(2) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and a final order (the "Final Order," and with the Interim Order, the "DIP Orders") authorizing the Debtor, as borrower, to obtain secured postpetition financing (the "DIP Financing" or the "DIP Facility") pursuant to the Consolidated Infrastructure Group, Inc. $3 Million Senior Secured Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions (the "DIP Term Sheet," and with the DIP Orders, the "DIP Facility Documents") attached hereto as Exhibit B. In support of the Motion, the Debtor relies upon and incorporates

---

[1] The last four digits of the Debtor's federal tax identification number are (6870). The mailing address for the Debtor is 11620 Arbor Street, Omaha, Nebraska 68144.

1

by reference the *Declaration of Michael G. Johnson in Support of First Day Pleadings* (the "First Day Declaration") filed with the Court concurrently with this Motion.  In further support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.   This Court has jurisdiction over this chapter 11 case, the Debtor, property of the Debtor's estate, and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

2.   Venue in this Court is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.   Pursuant to Rule 9013-1(f) of the Local Rules, the Debtor consents to the entry of a final order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.   The statutory and legal bases for the relief requested in this Motion are sections 105(a), 362, and 364(c)(2) of the Bankruptcy Code; Rules 2002, 4001, 6003, and 6004 of the Bankruptcy Rules and Rules 4001-2 and 9013-1 of the Local Rules.

## BACKGROUND

5.   On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

2

6.    Established in 2016 and headquartered in Omaha, Nebraska, the Debtor provides underground utility and damage prevention services to support companies that conduct underground construction and maintenance.  By providing detailed information on what lies beneath the surface, the Debtor is able to help protect communities from harms that could otherwise occur when parties, such as utility or other companies, dig underground.

7.    Specifically, the Debtor provides accurate, on-time damage prevention services to ensure its customers' valuable underground assets are protected.  These "811" locating services are tailored to the needs of each customer, and include handling emergency and real time notice locate requests, damage investigations (including testimonial support), extended locates, projects (including extraordinary projects), site surveillance, and route patrol and monitoring.

8.    Most of the Debtor's assets are unencumbered and most of its obligations are unsecured, with two exceptions related to letters of credit.  First, the Debtor is party to a lease (the "ARI Lease") with Automotive Rentals, Inc. and ARI Fleet, LT (collectively, "ARI"), through which the Debtor leases all of its vehicles used in the field.  Pursuant to the terms of the ARI Lease, the Debtor is required to maintain a letter of credit in an initial amount of $1.8 million (the "ARI LC"). As of the Petition Date, CIG holds approximately $1.23 million in a restricted account to cover the ARI LC.  Second, Wells Fargo Bank, National Association ("Wells Fargo") holds restricted cash in the amount of $75,000 as collateral for the Debtor's credit limit under its corporate credit card program.  The Debtor was in the process of terminating its corporate credit card program prior to the Petition Date.  The amounts funding the ARI LC and the restricted cash in connection with the corporate credit card program are held in the same restricted cash account at Wells Fargo.

9.   In 2016, the Debtor received an initial equity infusion from its parent company, CIG Holdings, LP ("CIG Holdings") and has received a few small, unsecured and undocumented advances from CIG Holdings since then.   As set forth in further detail in the First Day Declaration, in October 2016, the Debtor became embroiled in costly and time-consuming litigation, on which it has spent millions of dollars in litigation costs.   As a result, the Debtor has been forced to scale down its business operations significantly.   Instead of shutting down the Debtor's business, which could have caused a public safety crisis for the areas covered by the the customer contracts, the Debtor's board of directors sought financing to fund the Debtor's operations.   The DIP Lenders agreed to provide debtor in possession ("DIP") financing on a senior secured basis to facilitate the sale of the Debtor's assets and thereafter pursue a plan of liquidation.

## RELIEF REQUESTED

10. By this Motion, the Debtor seeks entry of the DIP Orders authorizing the Debtor to borrow funds under the DIP Facility in an aggregate principal amount of up to $3 million (the "DIP Loans"), pursuant to the terms and conditions of the DIP Term Sheet, and, prior to a final hearing for consideration of the Motion (the "Final Hearing"), borrow up to $1 million on an interim basis; modifying the automatic stay to the extent necessary to grant Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership, and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership as lenders (the "DIP Lenders") the security interests, liens, and secured claims set forth under the DIP Facility; and scheduling the Final Hearing.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY

11. Pursuant to Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Rules, the following is a concise summary of the proposed material terms of the DIP Facility and the DIP Term Sheet.

| | |
|---|---|
| **Borrower** | Consolidated Infrastructure Group, Inc. |
| **DIP Administrative Agent:** | Parallel49 Equity U.S. Management (Fund V), Inc., in its capacity as administrative agent and collateral agent (in such capacity, the "DIP Agent") under the DIP Facility. |
| **DIP Lenders**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership; and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership. |
| **DIP Facility/ Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | A senior secured non-amortizing U.S. dollar denominated term loan facility in an aggregate principal amount of up to $3 million consisting of new money commitments. The loans made thereunder (the "DIP Loans") may be drawn in multiple installments, with up to $1 million available upon entry of the Interim Order, and shall be subject to a budget approved by the DIP Lenders. |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The outstanding DIP Loans and other obligations under the DIP Facility shall bear interest at a fixed rate equivalent to LIBOR plus 9.00% *per annum*, which fixed rate shall be set as of the Closing Date.<br><br>Upon the occurrence of and continuation of an event of default, the DIP Loans will bear an interest at an additional 1.00% *per annum*. |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | N/A |
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | An initial budget through the period ending April 29, 2019 shall be prepared by the Debtor and approved by the DIP Lenders (once so approved, and subject to any update as may be approved by the DIP Lenders, as required in the DIP Facility Agreement, the "Approved Budget"). The Approved Budget shall be updated by the Debtor from time to time. The Debtor shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility, subject to (x) reasonable permitted variances approved by the DIP Lenders (the "Permitted Variance"), (y) the Interim Order (or the Final Order as applicable), and (z) the Carve-out.<br><br>The Debtor shall provide a budget variance report/reconciliation (the "Budget Variance |

| | |
|---|---|
| | Report") by 12:00 p.m. prevailing Central Time on Wednesday of each week for the week most recently ended: (i) showing by line item actual cash receipts, disbursements, professional fees, capital expenditures, and billings for the immediately preceding week, the immediately preceding rolling four-week, cumulative period on and after the entry of the Interim Order, noting therein all variance, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variance for such week; and (ii) certified by a responsible officer of the Debtor. |
| **Closing Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The first date upon which the Interim Order shall have been entered and all other conditions precedent to funding shall have been satisfied or waived. |
| **Conditions Precedent to the Initial Extension of Credit and Each Loan**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The initial extension of credit (the "<u>Closing</u>"; the date on which the Closing occurs, the "<u>Closing Date</u>") under each of the DIP Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent among others (and the conditions set forth under "<u>Conditions Precedent to Each Loan</u>" below):<br><br>i.    The Petition Date shall have occurred, and the Borrower shall be a debtor and a debtor-in-possession. The Interim Order and all other "first day orders" shall be in form and substance satisfactory to the Lenders.<br><br>ii.    Not later than 10 business days following the Petition Date (or such later date as the Lenders may agree), the Lenders shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Lenders (the "<u>Interim Order</u>"), authorizing and approving the making of the DIP Loans in the amounts consistent with those set forth in the "DIP Facility" section above, and the granting of the claims and liens and other liens referred to above under the heading "Security and Priority", which Interim Order shall not have been vacated, reversed, modified, amended or stayed.<br><br>iii.    No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case.<br><br>On the funding date of each DIP Loan after the initial extension of credit, (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the Term Sheet; (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance; (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (iv) the making of such DIP Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable; (v) termination statements with respect to the UCC financing statements filed by Citibank, N.A., Fidus Investment Corporation and CIBC Bank USA shall have been filed with the Delaware Department of State and delivered to the DIP Lenders; and (vi) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect. |
| **Maturity** | The DIP Facility shall mature upon the "<u>Termination Date</u>," which, with respect to the DIP Facility, shall be the earliest of: (i) the date that is nine months after the Petition Date, |

6

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | (ii) 45 days after the entry of the Interim Order if the Final Order has not been entered by the Court prior to the expiration of such period, (iii) the consummation of a sale of substantially all of the Debtor's assets, (iv) the substantial consummation of a plan of reorganization or a plan of liquidation filed in the Debtor's chapter 11 case that is confirmed pursuant to an order entered by the Court; or (v) the acceleration of the DIP Loans and termination of the commitment with respect to such DIP Facility in accordance with the DIP Term Sheet. |
| **Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | All unencumbered assets and property of the Debtor owned or hereafter acquired, as applicable, including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames, and other intellectual property and capital stock of subsidiaries, and the proceeds thereof, subject to exclusions, to be agreed upon, that are customary for facilities of this type ("Collateral"). |
| **DIP Liens/Super Priority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The obligations of the Debtor under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times pursuant to 364(c)(2) of the Bankruptcy Code, be secured by a perfected, first priority security interest and lien on the Collateral of the Debtor, including the proceeds of any claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (collectively, "Avoidance Actions") (it being understood that such lien on the proceeds of Avoidance Actions shall attach upon entry of the Final Order). |
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Mandatory prepayment of the DIP Loans shall be required with: (i) 100% of the net cash proceeds received for the incurrence of indebtedness not permitted by the express written consent of the DIP Lenders in their sole discretion; and (ii) 100% of the net cash proceeds from sales, recoveries, or other dispositions (including casualty events) of any Collateral (excluding the sale of inventory in the ordinary course of business and subject to other exceptions to be agreed upon).<br><br>The Debtor may, upon at least one (1) business day notice, prepay in full or in part, without premium or penalty, the DIP Loans. |
| **DIP Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility requires compliance with the following milestones ("DIP Milestones"), or such later dates as approved by the DIP Lenders in their sole discretion:<br><br>i.   Not later than a date that is 60 days following the Petition Date, the Debtor shall file with the Court, a motion to approve bidding procedures with respect to a sale of all or substantially all of the Debtor's assets, which motion shall be reasonably satisfactory to the DIP Lenders.<br><br>ii.   Not later than a date that is 90 days following the Petition Date, the Court shall enter an order approving the proposed bidding procedures, which bidding procedures shall be reasonably satisfactory to the DIP Lenders.<br><br>iii.   Not later than a date that is 120 days following the Petition Date, the Debtor shall consummate the sale of all or substantially all of its assets.<br><br>iv.   Not later than a date that is 150 days following the Petition Date, the Debtor shall file with the Court a plan of reorganization or a plan of liquidation and a disclosure statement, which plan and disclosure statement shall be reasonably |

7

|  | satisfactory to the DIP Lenders in their sole discretion. |
|---|---|
|  | v. Not later than a date that is 180 days following the Petition Date, the Court shall enter an order approving the disclosure statement, which disclosure statement shall be reasonably satisfactory to the DIP Lenders in their sole discretion. |
|  | vi. Not later than a date that is 210 days following the Petition Date, the Court shall enter an order confirming a plan of reorganization or a plan of liquidation, which plan shall be reasonably satisfactory to the DIP Lenders in their sole discretion. |
|  | vii. Not later than a date that is 270 days following the Petition Date, such plan of reorganization or plan of liquidation, which plan shall be reasonably satisfactory to the DIP Lenders in their sole discretion, shall become effective. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The events of default (the "Events of Default," and each an "Event of Default") shall include the following: (i) failure to pay principal or interest at the Termination Date or as set forth in the DIP Facility Documents; (ii) breaches of representations and warranties; (iii) failure to comply with covenants; (iv) postpetition judgments subject to carve-outs; (v) actual or asserted invalidity or impairment of any DIP Facility Documents (including the failure of any lien to remain perfected); (vi) change of ownership or control; (vii) failure of subordination; (viii) the entry of an order dismissing the Debtor's bankruptcy case or converting the Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code, or the filing by the Debtor of a motion or other pleading seeking entry of such order; (ix) a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Debtor's bankruptcy case, the Debtor applies for, consents to, or acquiesces in, any such appointment, or the Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lenders in their sole discretion; (x) the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the DIP Lenders, or the filing by the Debtor of an application, motion or other pleading seeking entry of such an order; (xi) the entry of an order in the Debtor's bankruptcy case granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Debtor in excess of an amount to be mutually agreed upon; (xii) the entry of a final non-appealable order in the Debtor's bankruptcy case charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or the commencement of any other actions by the Debtor that challenges the rights and remedies of the DIP Lenders under the DIP Facility in the Debtor's bankruptcy case or that is inconsistent with the DIP Facility Agreement; (xiii) without the consent of the DIP Lenders, the entry of an order in the Debtor's bankruptcy case seeking authority to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; (xiv) termination or expiration of any exclusivity period for the Debtor to file or solicit acceptances for a plan of reorganization or a plan of liquidation; (xv) the filing or support of any pleading by the Debtor, seeking, or otherwise consenting to, any of the matters set forth in clauses (viii) through (xiv) above; (xvi) the entry of the Final Order shall not have occurred within 45 days after the entry of the Interim Order (or such later date as the DIP Lenders may reasonably agree); (xvi) except with the consent of the DIP Lenders, an order of the Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Debtor's bankruptcy case pursuant to section 364(c)(1) of the Bankruptcy Code or senior secured status pursuant to section 364(c)(2) of the Bankruptcy Code senior to or *pari passu* with |

8

<table>
<tr><td></td><td>the claims of the DIP Lenders under the DIP Facility; and (xvii) a plan of reorganization or plan of liquidation shall be confirmed in the Debtor's bankruptcy case that is not acceptable to the DIP Lenders or any order shall be entered to dismiss the Debtor's bankruptcy case and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Debtor's obligations under the DIP Facility and that is not otherwise reasonably satisfactory to the DIP Lenders, or the Debtor shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

Notwithstanding anything to the contrary contained herein, any Event of Default under the DIP Term Sheet shall be deemed not to be continuing if the events, acts, or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of action or omitting to take any action) or have ceased to exist.

Upon the occurrence of an Event of Default, the DIP Lenders may (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtor, and (iii) the termination of the DIP Facility Agreement as to any future liability or obligation of the DIP Lenders, but without affecting any of the liens or obligations under the DIP Facility and (y) upon the giving of 5 calendar days' notice to the Debtor (the "<u>Remedies Notice Period</u>"), exercise all other rights and remedies provided for in the DIP Facility Agreement and applicable law.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.</td></tr>
</table>

| | |
|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | N/A |
| **Purposes for Use of Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | N/A |
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv); 4001(c)(1)(B)(ii)* | N/A |
| **Carve-Out**<br><br>*Bankruptcy Rule* | The "<u>Carve-Out</u>" is an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee |

| | |
|---|---|
| *4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtor or the official committee of unsecured creditors appointed in the Debtor's bankruptcy case (the "Creditors' Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order, and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery to the Borrower of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, the Interim Order or Final Order; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtor, the Debtor's counsel, the United States Trustee for the District of Delaware, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $300,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds.<br><br>Notwithstanding the foregoing, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with: (i) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Lenders; (ii) attempts to modify any of the rights granted to the DIP Lenders; (iii) attempts to prevent, hinder, or otherwise delay any of the DIP Lenders' assertion, enforcement, or realization upon any Collateral in accordance with the DIP Facility Documents; (iv) paying any amount on account of any claims arising before the commencement of the Debtor's case unless such payments are approved by an order of the Court; or (v) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary in the DIP Term Sheet, the Carve-Out shall be senior to all liens and claims securing the DIP Loans and any and all other liens or claims securing the DIP Facility. |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to permit the Debtor to grant the DIP Liens. |
| **Section 506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | N/A |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtor will indemnify and hold harmless the DIP Lenders and their respective affiliates, officers, directors, employees, agents and advisors from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Facility Documents and Debtor's use of the financing provided thereunder. |

| | The indemnification survives and continues for the benefit of all such persons or entities. |
|---|---|
| **Lien on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | The obligations of the Debtor under the DIP Facility shall, subject to the Carve-Out, at all times pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected, first priority security interest and lien on the proceeds of Avoidance Actions(it being understood that such lien on the proceeds of Avoidance Actions shall attach upon entry of the Final Order). |
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Upon entry of the Final Order, the DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.  However, the DIP Lenders are not seeking a waiver of the applicability of  the equities of  the case exception under section 552(b) of the Bankruptcy Code with respect to any of the Collateral. |

**Highlighted Provisions Under Local Rule 4001-2(a)(1)**

12. The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules. The provisions described in Rule 4001-2(a)(i) of the Local Rules, to the extent applicable, are set forth at the following sections of the Interim Order:

a. **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.** The Interim Order does not provide for cross collateralization or contain provisions that grant cross collateralization protection.

b. **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens.** The Interim Order contains no provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection, or amount of any prepetition liens.

c. **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.** The Interim Order does not provide for a waiver of any right to asset claims or to surcharge against the Collateral.

d. **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.** Subject to the entry of the Final Order, the obligations of the Debtor under the DIP Facility shall, subject to the Carve-Out, at all times pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected, first priority security interest and lien on the proceeds of Avoidance Actions.  *See* Interim Order, at ¶¶ 8, 24(j).

e. **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.** The Interim Order contains no provisions that deem prepetition debt to be postpetiton debt or that use postpetition loans from a

11

prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.

f. **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions that provide for disparate treatment of professionals retained by a Creditors' Committee, if any, with respect to the Carve-Out.

g. **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.** As the security interests and liens securing the DIP Facility are only on unencumbered assets and property of the Debtors, the Interim Order does not provide for non-consensual priming of any existing lien.

h. **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.** Upon Entry of the Final Order, the DIP Lenders shall not but subject to the equitable doctrine of marshalling or any other similar doctrine with respect to the Collateral. *See* Interim Order, at ¶¶ E(viii), 29. The DIP Lenders are not seeking a waiver of the applicability of the equities of the case exception under section 522(b) of the Bankruptcy Code with respect to any of the Collateral.

## BASIS FOR RELIEF

I.     **The DIP Facility Should Be Approved**

A.  **The Debtor Is Authorized To Incur The DIP Obligations Under Section 364(c)(2) Of The Bankruptcy Code**

13. The Debtor proposes to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c)(2) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under § 364(c)(2)

12

authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking credit under § 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to § 364(b)).

14. As set forth above and in further detail in the First Day Declaration, prior to the Petition Date, CIG Holdings provided small, undocumented advances to the Debtor on an unsecured basis. The Debtor also received small amounts of credit from its trade creditors. Because of the constricted liquidity that resulted from litigation, the Debtor determined that the best course of action under the circumstances was to sell substantially all of its assets pursuant to section 363 of the Bankruptcy Code, wind down its remaining operations, and liquidate its remaining assets. Both CIG Holdings and the DIP Lenders were unwilling to extend financing to the Debtor on an unsecured basis. The DIP Lenders, however, agreed to provide the DIP Facility with favorable financing terms, including, but not limited to, not requiring the payment of fees in connection with the DIP Facility to the DIP Lenders and offering a low interest rate.

15. Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(2) of the Bankruptcy Code provides that a debtor may obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien." 11 U.S.C. § 364(c)(2). The vast majority of the Debtor's assets and property of the estate are unencumbered. Further, as described above, the Debtor was unable to obtain unsecured credit or postpetition financing on a junior basis under section 364(c)(3) of the Bankruptcy Code. Therefore, approval of the DIP Claims in favor of the proposed DIP Lenders is reasonable and appropriate.

### B.  The DIP Financing Is Necessary To Preserve The Value Of The Debtor's Estate

16. The Debtor has immediate liquidity needs and requires financing to fund its operations, the administration of the bankruptcy case, and the process of selling substantially all of its assets. Among the Debtor's most valuable assets are its customer contracts, which required continued performance.  Halting performance under the Debtor's customer contracts may also cause a public safety concern.

17. The initial success of the Debtor's chapter 11 case at the outset depends on the comfort level of the Debtor's constituents, which in turn depends on the Debtor's ability to minimize the disruption caused by the bankruptcy filing.  Approval and implementation of the DIP Financing ensures continued functioning of the Debtor's operations, together with approval of the maintenance of the Debtor's cash management system, and will preserve the going concern value of the Debtor's estate in order to consummate a sale of substantially all of its assets to maximize value for all stakeholders.

### C.  The Terms Of The DIP Financing Are Fair, Reasonable, And Appropriate

18. After appropriate investigation and analysis, the Debtor has concluded that the DIP Financing presents the best route available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  *See Ames*, 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and (d) if the debtors was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility

14

"reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

19. Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (citations omitted).

20. The terms and conditions of the DIP Financing are fair and reasonable. In the reasonable exercise of the Debtor's business judgement, the DIP Financing is the best financing option available under the present circumstances. As discussed above, the Debtor assessed its financing needs and the DIP Financing proposal. More advantageous financing alternatives or advances similar to that which was provided by CIG Holdings prepetition were not available. The DIP Lenders, however, have agreed to extend financing secured only by unencumbered assets to the Debtor without financing, prepayment or other fees and at a low interest rate. Therefore, the Debtor decided to accept the DIP Financing with the DIP Lenders.

21. The proposed DIP Financing subjects the security interests and secured claims of the DIP Lenders to the Carve-Out, thereby ensuring that in the event of a default under the DIP Term Sheet, the Debtor's estate and other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in this case. In *Ames Dept. Stores*, the court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and debtors' estates could retain assistance from counsel. *See Ames*, 115 B.R. at 38-40 (observing that courts insist on carve-outs

for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

22. Further, the DIP Milestones are a crucial element of the terms of the DIP Financing, and their inclusion in the Interim Order is important to ensure that the chapter 11 case proceeds in a strategic, value-maximizing fashion.  In similar contexts, other courts in this district have entered interim financing orders that included express milestones for the progress of a debtor's case.  *See, e.g. In re Horsehead Holding,* Case No. 16-10287 (CSS) (Bankr D. Del. Feb. 4, 2016) [D.I. 81] (approving case milestones in interim DIP financing order); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del Jan. 27, 2016) [D.I. 105]; *In re Cal Dive International,* Case No. 15-10458 (CSS) (Bankr. D. Del March 9, 2015) [D.I. 74] (interim order approving DIP financing with case milestones); *In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 10, 2014) [D.I. 58]; *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del Jan. 14, 2013) (approving case milestones in interim DIP financing order).

23. Finally, this Court has previously approved DIP Facilities where the parties to the financing had entered into a binding term sheet rather than a full credit agreement.  *See*, *e.g.*, *In re Alcor Energy, LLC*, Case No. 18-12839 (CSS) (Bankr. D. Del. Dec. 21, 2018) [D.I. 27]; *In re ABT Molecular Imaging, Inc.*, Case No. 18-11398 (LSS) (Bankr. D. Del. Jun. 15, 2018) [D.I. 33]; *In re Outer Harbor Terminal, LLC*, Case No. 16-10283 (LSS) (Bankr. D. Del. Feb. 9, 2016) [D.I. 52].  Thus, for these reasons and the reasons set forth above, the DIP Facility on the terms set forth in the DIP Term Sheet should be approved.

### D.  Modification Of The Automatic Stay Is Appropriate

24. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Facility Documents require a modification of the automatic stay to implement the terms of the DIP Financing.

25. Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances.  As noted above, the Debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations. Nor has the Debtor been able to obtain DIP financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated by well-represented parties in good faith and at arms' length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtor by the DIP Financing, the modification of the automatic stay is more than warranted.

### E.  A Final Hearing Should Be Set

26. Pursuant to Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than thirty (30) days following the Petition Date.

27. The Debtor requests authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties set forth in paragraph 33 hereto.  The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

### F.  The Requirements of Bankruptcy Rule 6003 Are Satisfied.

17

28. Rule 6003 of the Bankruptcy Rules empowers a court to grant relief within the first twenty-one (21) days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."

29. For the reasons discussed above, authorizing the Debtor to obtain postpetition secured financing under the DIP Facility and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Facility, as well as granting the other relief requested herein, is integral to the Debtor's ability to transition its operations into chapter 11 and consummate a sale of substantially all assets.  Failure to receive such authorization during the first twenty-one (21) days of the case would severely disrupt the Debtor's operations at this critical juncture.  For the reasons discussed herein, the request is necessary in order for the Debtor to operate its business in the ordinary course and maximize the value of its estate for the benefit of all stakeholders. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Rule 6003 of the Bankruptcy Rules to support granting the relief requested herein.

### G.  Bankruptcy Rule 6004(a) Should Be Waived

30. To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Rule 6004(a) of the Bankruptcy Rules.

31. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to sell substantially all of its assets.  Accordingly, the Debtor submits that ample cause exists to

18

justify a waiver of the 14-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

## **RESERVATION OF RIGHTS**

32. Nothing contained herein is intended or should be construed as an admission regarding the validity of any claim against the Debtor, a waiver of the Debtor's right to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code. The Debtor expressly reserves its right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should be construed as an admission as to the validity of any claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## **NOTICE**

33. Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties on the Debtor's list of twenty (20) largest creditors; (iv) the DIP Lenders; (v) DLA Piper LLP (US), as counsel to the DIP Lenders; (vi) the Internal Revenue Service; (vii) the Banks; (viii) Automotive Rentals, Inc.; (ix) any parties known after reasonable inquiry to have asserted a lien against the Debtor's assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtor respectfully submits that no further notice of this Motion is required.

*[Remainder of Page Left Intentionally Blank]*

19

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein on an interim basis, and the Final Order, granting the relief requested herein on a final basis, and granting such other and further relief as the Court may deem necessary and proper.

Dated: January 30, 2019  
      Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ *Daniel J. DeFranceschi*
Daniel J. DeFranceschi (No. 2732)
Russell C. Silberglied (No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: defranceschi@rlf.com
       silberglied@rlf.com
       heath@rlf.com
       shapiro@rlf.com

*Proposed Counsel to the Debtor and Debtor in Possession*

**EXHIBIT A**

**(Interim Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| CONSOLIDATED INFRASTRUCTURE GROUP, INC.,[1] | : Case No. 19-_____ (___) |
|  | : |
|  | : Re: D.I. No.: ___ |
| Debtor | : |

-----------------------------------------------------------------x

### INTERIM ORDER (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(2), AND 364(e), AND (B) GRANT SENIOR LIENS WITH RESPECT THERETO; (II) MODIFYING THE AUTOMATIC STAY TO THE EXTENT NECESSARY; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Consolidated Infrastructure Group, Inc. (the "**Debtor**"), as borrower (the "**Borrower**"), as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Case**"), pursuant to Bankruptcy Code sections 105, 362, 364(c)(2) and 364(e), Bankruptcy Rules 2002, 4001, 6003, and 6004, and Rule 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking entry of an interim order (this "**Interim Order**") and a final order (the "**Final Order**") authorizing the Debtor to borrow funds under the DIP Facility, as set forth in the DIP Term Sheet (together with this Interim Order and the Final Order, the "**DIP Facility Documents**") in an aggregate principal amount up to $3,000,000 and, prior to a final hearing on the Motion (the "**Final Hearing**"), borrow up to $1,000,000 on an interim basis pursuant to the terms and conditions of the DIP Term Sheet attached hereto as <u>Exhibit 1</u>, modifying the automatic stay to the extent necessary to grant the

---

[1]     The last four digits of the Debtor's federal tax identification number are (6870).  The mailing address for the Debtor is 11620 Arbor Street, Omaha, Nebraska 68144.

[2]     Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the Motion.

DIP Lenders the security interests, liens and secured claims set forth under the DIP Facility; and scheduling the Final Hearing; and the Court having considered the Motion, the exhibits attached thereto, the DIP Term Sheet, and the evidence submitted or adduced and the arguments of counsel made at the hearing; and the *Declaration of Michael G. Johnson in Support of Chapter 11 Petition and First Day Pleadings*; and notice of the hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014, and Local Rules 2002-1, 4001-1(a), 5005-1 and 9013-1(m); and the hearing to consider the interim relief requested in the Motion (the "**Interim Hearing**") having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

A.      *Petition Date*.  On January 30, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing the Case.

B.      *Debtor in Possession*.  The Debtor is continuing in the management and operation of its business and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

RLF1 20729430v.2

C.    _Jurisdiction and Venue_.    The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the _Amended Standing Order of Reference_ from the United States District Court for the District of Delaware, dated as of February 29, 2012, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief sought in the Motion are sections 105, 362, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, and 6004 and the applicable Local Rules.

D.    _Committee Formation_.    As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed any statutory committee (each, a "**Statutory Committee**") in the Case.

E.    _Findings Regarding Post-Petition Financing_.

(i)    _Good cause_. Good cause has been shown for the entry of this Interim Order.

(ii)    _Request for Post-Petition Financing_.  The Debtor seeks authority to borrow funds under the DIP Term Sheet.  The DIP Lenders shall have no obligation to make loans or advances under the DIP Facility except to the extent required under the DIP Facility Documents and no obligation to waive any conditions required thereunder.

(iii)    _Need for Post-Petition Financing_.  The Debtor's need to obtain credit on the terms set forth in the DIP Term Sheet is immediate and critical in order to enable the Debtor to continue operations and to administer and preserve the value of its estate.  The ability of the Debtor to finance its operations, maintain business relationships, pay employees, protect the value of its assets and otherwise finance its operations requires

3

the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, creditors and stakeholders, and the possibility for maximizing the value of its businesses.  The Debtor does not have sufficient available sources of working capital and financing to operate its business or to maintain its properties in the ordinary course of business without the DIP Facility. Consummating the financing contemplated by the DIP Term Sheet pursuant to the terms of this Interim Order therefore is in the best interests of the Debtor's estate.

(iv)    *No Credit Available on More Favorable Terms*.  Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to reasonably obtain post-petition financing from sources other than the DIP Lenders on terms more favorable than those set forth in the DIP Facility Documents.  The Debtor has been unable to reasonably obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without granting the DIP Lenders perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets with the priorities set forth herein and the other protections set forth in this Interim Order.

(v)    *Use of Proceeds*.

a.    As a condition to entry into the DIP Facility Documents and the extensions of credit under the DIP Facility, the DIP Lenders require, and the Debtor has agreed, that proceeds of the DIP Facility shall be used in accordance with the terms of the DIP Facility Documents, including the Approved Budget, attached hereto as Exhibit 2, which shall be subject to (x) reasonable variances permitted by the DIP Lenders (the "**Permitted Variance**"), (y) this Interim Order (or the Final Order as applicable), and (z) the Carve-Out.

b.    The Debtor shall not directly or indirectly pay any expense or other disbursement other than those set forth in the Approved Budget (other than expenses with respect to the Carve-Out) outside of the

4

Permitted Variance or otherwise permitted or directed by an order of the Court.

c.    The proceeds of the DIP Facility shall be used solely as provided in the DIP Term Sheet, including, to the extent provided therein, (i) to provide working capital and letters of credit from time to time to the extent set forth in the Approved Budget; (ii) for general corporate purposes of the Debtor to the extent set forth in the Approved Budget; (iii) subject to the Approved Budget (other than with respect to the Carve-Out) or any order governing the compensation of professionals retained in this Case, for payment of costs and administration of the Case; and (iv) for the payment of such other prepetition obligations in accordance with "first day" orders, which orders shall be in form and substance reasonably satisfactory to the DIP Lenders and approved by the Court, in each case in a manner consistent with the Approved Budget and the terms and conditions contained herein.

(vi)    *Willingness to Provide Financing.*  The DIP Lenders have indicated a willingness to provide financing to the Debtor subject to the entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtor's estates, that the DIP Lenders are extending credit to the Debtor as set forth in the DIP Facility Documents in good faith, and that the DIP Lenders' claims, security interests, liens, rights, and other protections will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order, the Final Order or any other order.  As a condition to the entry into the DIP Facility Documents and the extension of credit under the DIP Facility, the Debtor, the DIP Agent and the DIP Lenders have agreed that proceeds of Collateral and all payments and collections received by the Debtor shall be applied solely as set forth in the DIP Facility Documents.

(vii)    *Business Judgment and Good Faith Pursuant to Section 364(e).* The extension of credit under the DIP Facility and the DIP Facility Documents, including

the DIP Term Sheet, is fair, reasonable, and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and consideration, and were entered into at arm's-length, under no duress, and without undue influence, negligence or violation of public policy or law.  The DIP Facility and the DIP Facility Documents, including the DIP Term Sheet, were negotiated in good faith and at arm's length among the Debtor and the DIP Lenders, under no duress, and without undue influence, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility and all documents related to any and all transactions contemplated by the foregoing.  Any credit to be extended as set forth in the DIP Facility Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lenders are therefore entitled to the protections and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(viii)    *Marshalling*.  Subject to the entry of the Final Order, in light of the Approved Budget covering all administrative costs projected by the Debtor, the DIP Lenders are entitled to a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

(ix)    *Final Hearing*.  At the Final Hearing, the Debtor will seek final approval of the proposed post-petition financing arrangements pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Lenders. Notice of the Final

Hearing and Final Order will be provided in accordance with this Interim Order and no further notice, except as provided by this Interim Order, shall be required.

(x)     *Immediate Entry*. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Bankruptcy Rule 4001-2(b).  The authorization granted herein on an interim basis to enter into the DIP Facility Documents, and to borrow under the DIP Facility is necessary to avoid immediate and irreparable harm to the Debtor and its estates during the period (the "**Interim Period**") beginning on the date hereof through and including the earliest to occur of (i) the date of the entry of the Final Order by this Court and (y) the Termination Date (as defined below).  This Court concludes that the entry of this Interim Order is in the best interests of the Debtor and its estates and creditors because it will, among other things, allow the Debtor to maximize the value of their assets.

(xi)     *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee; (ii) the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors; (v) the DIP Lenders; (vi) counsel to the DIP Lenders; (vii) financial institutions where the Debtor holds bank accounts; (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (ix) Automotive Rentals, Inc. Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein, and the Interim Hearing constitutes appropriate notice thereof and

RLF1 20729430v.2

complies with Bankruptcy Rules 4001(c) and the Local Rules, and no further notice of the relief granted herein is necessary or required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    _Motion Approved_.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.

2.    _Objections Overruled_.  All objections to and reservations of rights with respect to the Motion and to the entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled on the merits in their entirety.

**DIP Facility Authorization**

3.    _Authorization of the DIP Facility Documents_.  The Debtor is hereby authorized to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Term Sheet and the other DIP Facility Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith. The Borrower is hereby authorized to borrow money under the DIP Term Sheet, on an interim basis, and request extensions of credit under the DIP Facility in accordance with the terms of this Interim Order and the DIP Term Sheet, _provided_ that during the Interim Period an aggregate principal amount of up to $1,000,000 may be borrowed.

4.    _Authorized Action_.  In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents that may be necessary or required for performance by the Debtor under the DIP Term Sheet and the other DIP Facility Documents and the creation and perfection of the DIP Liens described in, provided for and perfected by this Interim Order, the DIP Term Sheet and the DIP Facility Documents.  Subject to paragraph 10, the Debtor is hereby authorized

8

to pay, in accordance with this Interim Order, the principal, interest, expenses and other amounts described in the DIP Facility Documents as such become due and without need to obtain further Court approval, including, without limitation, the fees and disbursements of the DIP Lenders' attorneys, advisers, accountants and other consultants.  All fees, if any, shall be fully earned upon entry of this Interim Order and payable in accordance with the DIP Facility Documents.

5.    <u>Validity of DIP Obligations</u>.  Upon entry of this Interim Order and execution and delivery, the DIP Term Sheet shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estates in accordance with its terms, and subject to the terms of this Interim Order.  The DIP Term Sheet and this Interim Order constitute and evidence the validity and binding effect of the obligations thereunder of the Debtor, which obligations shall be enforceable, jointly and severally, against the Debtor, its estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Case or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Case (a "**Successor Case**").  No obligation, payment, transfer, or grant of a security or other interest to the DIP Lenders under the DIP Facility Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, or counterclaim. The obligations of the DIP Facility include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtor to the DIP Lenders under the DIP Facility Documents, including without limitation all principal, interest, costs, fees, expenses and other amounts owed pursuant to the DIP Facility Documents.

9

6. <u>No Obligation to Extend Credit</u>.  The DIP Lenders shall have no obligation to make loans or advances under the DIP Facility until the conditions precedent to the closing and the making of such extensions of credit under the DIP Term Sheet or the other DIP Facility Documents have been satisfied in full or waived.

7. <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor is authorized to use extensions of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Facility Documents and in compliance with the Approved Budget.  The Debtor is authorized, subject to the satisfaction of the conditions set forth in the DIP Facility Documents, to use proceeds of the Collateral, subject to the Carve-Out, and to draw upon the DIP Facility (a) to pay fees, costs and expenses incurred in connection with the transactions contemplated by the DIP Facility Documents; (b) to pay other administration costs incurred in connection with the Case consistent with the Approved Budget; (c) to pay for other working capital and general corporate purposes of Debtor consistent with the Approved Budget and the "first day" orders entered by the Court; and (d) after delivery of a Carve-Out Trigger Notice, to fund a reserve to pay the Carve-Out.

**DIP Liens and Collateral**

8. Effective immediately upon entry of this Interim Order, pursuant to section 364(c)(2) of the Bankruptcy Code, and without the necessity of the execution by the Debtor (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the DIP Agent or the DIP Lenders of any Collateral, the DIP Lenders are hereby granted a continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected, *nunc pro tunc* to the Petition Date, post-petition security interests in and liens (collectively, the "**DIP Liens**") on any and all unencumbered property, assets and real and

10

personal property of the Debtor currently owned and hereafter acquired (the "**Collateral**"), including, without limitation, the following: (a) commercial tort claims; (b) all books and records pertaining to the other property described in this Paragraph; (c) all property of the Debtor held by any party, including all property of every description, in the custody of or in transit to any party for any purpose, including safekeeping, collection or pledge, for the account of the Debtor or as to which the Debtor may have any right or power, including but not limited to unencumbered cash; (d) all other goods (including but not limited to fixtures) and personal property of the Debtor, whether tangible or intangible and wherever located; (e) the proceeds of any Avoidance Actions (subject to the entry of a Final Order); and (f) to the extent not covered by the foregoing, all other unencumbered assets or property of the Debtor, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing, and in each case to the extent of the Debtor's respective interest therein.

        9.     <u>DIP Lien Priority</u>.

        (a)     *DIP Liens*.  The DIP Liens shall be junior only to the Carve-Out (as applicable), and shall otherwise be senior in priority and superior to any and all unsecured liens or claims on or to any of the Collateral.

        (b)     *Treatment of DIP Liens*.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any

11

Successor Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Case or any Successor Case.  The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

**Provisions Common to DIP Financing Authorizations**

10.    Carve-Out.

(a)    *Carve-Out*.  As used in this Interim Order and the DIP Facility Documents, the term "**Carve-Out**" shall mean the sum (i) all fees required to be paid to the clerk of the Court or any claims and noticing agent acting in such capacity and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Allowed Fees**") incurred by persons or firms retained by the Debtor or a Statutory Committee, if any, whose retention is approved by the Court pursuant to section 327, 328 or 363, and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other compensation order entered by the Court that are incurred (A) at any time before delivery to the Debtor by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, the Interim Order or Final Order; and (B) after the occurrence (the "**Trigger Date**") and during the continuance of an Event of Default and delivery of written

12

notice (the "**Carve-Out Trigger Notice**") thereof (which may be by electronic mail) to the Debtor, the Debtor's counsel, the U.S. Trustee, and lead counsel for any Statutory Committee, if any, in an aggregate amount not to exceed $300,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lenders, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Facility Documents, including the DIP Term Sheet, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, or 550 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' assertion, enforcement or realization upon any Collateral in accordance with the DIP Loan Documents and the Final Order; (d) paying any amount on account of any claims arising before the commencement of the Case unless such payments are approved by an order of the Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.

(b)     *No Direct Obligation to Pay Allowed Fees; No Waiver of Right to Object to Fees*.   Other than the funding of the Carve-Out with the proceeds of the DIP Facility as provided herein and in the DIP Facility Documents, the DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred

13

in connection with this Case, any Successor Case, or otherwise.  Nothing in this Interim Order or otherwise shall be construed: (i) to obligate the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, other than the Carve-Out; (ii) to increase the Carve-Out if incurred or Allowed Fees are higher in fact than the fees and disbursements of Professional Person set forth in the Approved Budget after the occurrence of the Trigger Date; (iii) as consent to the allowance of any fees and expenses of Professional Persons; or (iv) to affect the rights of the DIP Lenders or any other party-in-interest to object to the allowance and payment of such fees and expenses.

(c)    *Payment of Compensation*.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Persons or shall affect the right of the DIP Lenders to object to the allowance and payment of such fees and expenses. So long as no Termination Event has occurred and is continuing, the Debtor shall be permitted to pay fees and expenses allowed and payable by order (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, solely to the extent set forth in the Approved Budget and not to exceed the amounts set forth in the Approved Budget, *provided* that any such payment shall be subject to entry of a final order of the Court on final application for allowance of fees and expenses to be filed for each Case Professional (including ordinary course professionals).

11.    <u>Drafting, Execution and Modification of DIP Facility Documents</u>.  The Debtor and the DIP Lenders are hereby authorized, to implement, in accordance with the terms of the respective DIP Term Sheet, any non-material modifications of the DIP Term Sheet without further order of this Court.  Upon entry of this Interim Order, all material modification or

amendment of the DIP Term Sheet shall only be permitted pursuant to an order of this Court on notice pursuant to Local Rule 2002-1(b) and a hearing.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the DIP Term Sheet shall be effective unless set forth in writing, signed on behalf of the Debtor and the DIP Lenders.

12.    <u>Use of Proceeds; Budget Maintenance</u>.  The proceeds of the DIP Facility shall be used solely in accordance with the terms of the DIP Term Sheet, including the Approved Budget (subject to the Permitted Variance and the Carve-Out), and this Interim Order.  The Approved Budget shall be updated, modified or supplemented (with the consent of and/or at the request of the DIP Lenders) from time to time, solely in accordance with the DIP Term Sheet.

13.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to permit the Debtor to grant the DIP Liens.

14.    <u>Right to Credit Bid</u>. Subject to Section 363(k) of the Bankruptcy Code, each of the DIP Lenders shall have the right to "credit bid" up to the full allowed amount of their respective claims in connection with any sale of all or any portion of the Collateral, including, without limitation, sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of a restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

15.    <u>Automatic Perfection of DIP Liens</u>.

(a)    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording financing statements, intellectual property filings, mortgages,

RLF1 20729430v.2

notices of lien or similar instruments in any jurisdiction, taking possession of or control over, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lenders to the priorities granted herein.

(b)     Notwithstanding the foregoing, the DIP Lenders and the DIP Agent are hereby authorized to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent or any DIP Lender chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order.

(c)     The Debtor is authorized to execute and deliver promptly upon demand to the DIP Lenders, all such financing statements, mortgages, control agreements, notices and other documents as any of the DIP Lenders may reasonably request. The Debtor is authorized to, and shall, execute and deliver to the DIP Lenders such agreements, financing statements, mortgages, instruments and other documents as any of the DIP Lenders may reasonably request to evidence, confirm, validate, or perfect the DIP Liens; and the failure by the Debtor to execute any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.

16

(d)     The DIP Lender, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, and accordingly, each officer is authorized to accept and record the photocopy of this Interim Order, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

(e)     Subject to entry of the Final Order and section 1146(a) of the Bankruptcy Code, except as otherwise provided herein, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Subject to entry of the Final Order, any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the DIP Lenders in accordance with the terms of this Interim Order.

16.     Proceeds of Subsequent Financing.  If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in the Case or any Successor Case, shall obtain credit or incur debt in breach of the DIP Facility Documents at any time prior to the repayment in full of all obligations under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and its estate, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lenders to be applied in accordance with this Interim Order and the DIP Term Sheet.

17

17.     <u>Maintenance of Collateral/Cash Management</u>.  Until the payment in full in cash of all obligations of the DIP Facility, and the termination of the obligation of the DIP Lenders to extend credit under the DIP Facility, the Debtor is authorized to (a) maintain and insure the Collateral in amounts, for the risks, and by the entities as required under the DIP Facility Documents and (b) maintain their cash management system as in effect as of the Petition Date, (i) subject to the DIP Facility Documents; (ii) subject to any order of this Court with respect to the Debtor's cash management system, as may be modified, with the prior written consent of the DIP Lenders, by any order that may be entered by this Court and (iii) in a manner which, in any event, shall be reasonably satisfactory to the DIP Lenders.  Other than as expressly required pursuant to the DIP Facility Documents, any order of this Court with respect to the Debtor's cash management system or this Interim Order, no modifications to the Debtor's cash management system existing as of the Petition Date may be made without the prior approval of the DIP Lenders.

18.     <u>Reserved</u>.

19.     <u>Termination Event</u>.  The occurrence of an Event of Default under the DIP Term Sheet is referred to herein as a "Termination Event."

20.     <u>Rights and Remedies Following Termination Event</u>.

(a)     *Termination*.    Immediately upon the occurrence and during the continuation of a Termination Event, the DIP Lenders, with no further action of this Court, may notify the Debtor in writing that a Termination Event has occurred and is continuing (such notice, a "**Termination Notice**" and the date of any such notice, the "**Termination Notice Date**").

18

(b)     *Notice of Termination.*     Any Termination Notice shall be given by electronic mail (or other electronic means) to counsel to the Debtor, counsel to any Statutory Committee (if one has been formed, or if one has not been formed, the Debtor's consolidated 20 largest creditors), and the U.S. Trustee. The Remedies Notice Period shall commence on the Termination Notice Date and shall expire five (5) business days after the Termination Notice Date (the "**Remedies Notice Period**", and the date of the expiration of the Remedies Notice Period, the "**Termination Date**").

(c)     Without limiting the rights and remedies of the DIP Lenders under the DIP Term Sheet, the DIP Lenders, may immediately (I) upon the occurrence of and during the continuation of a Termination Event following the issuance of a Termination Notice or (II) the Termination Date, *inter alia*, (A) declare (x) subject to the Remedies Notice Period, all obligations owing under the DIP Facility Documents to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtor, (y) the termination, reduction or restriction of any further commitment to extend credit to the Borrower to the extent any such commitment remains, and (z) terminate the DIP Facility and the DIP Facility Documents as to any future liability or obligation of any DIP Lender, , but without affecting any of the liens or the obligations (any of the actions set forth in the foregoing (x), (y) and (z), a "**Termination**"); and (B) unless the Court orders otherwise during the Remedies Notice Period, exercise all other rights and remedies provided in the DIP Facility Documents and applicable law.

(d)     During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with this Court for the purpose of contesting a Termination, including whether a Termination Event has occurred and/or is continuing.  During the Remedies

19

Notice Period, the Debtor may continue to use the Collateral in the ordinary course of business and consistent with the most recent Approved Budget (subject to the Permitted Variance), but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business or otherwise in furtherance of the administration of the Case.

21.    <u>Good Faith.</u>

(a)    *Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order.*  Each of the DIP Lenders has acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Court, or any other court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.

22.    <u>Proofs of Claim.</u>  Subject to entry of the Final Order, any order entered by the Court establishing a bar date for any claims (including without limitation administrative claims) in the Case or any Successor Case shall not apply to any DIP Lenders (solely in their capacity as such).  Subject to entry of the Final Order, the DIP Lenders (solely in their capacity as such) shall not be required to file proofs of claim or requests for approval of administrative expenses authorized by this Interim Order in the Case or any Successor Case, and the provisions of this Interim Order, and, upon the entry thereof, the Final Order, relating to the amount of the obligations under the DIP Facility and the DIP Liens shall constitute a timely filed proof of claim

20

and/or administrative expense request.  For the avoidance of doubt, subject to entry of the Final

Order, the books and records of the DIP Lenders shall be deemed conclusive as to the amount of

the claims of each such party.

23.     <u>Rights of Access and Information</u>.  Without limiting the rights of access and

information afforded the DIP Lenders under the DIP Term Sheet, the Debtor shall be, and hereby

are, required to afford representatives, agents and/or employees of the DIP Lenders reasonable

access to the Debtor's premises, knowledgeable officers of the Debtor, and its books and records,

and shall reasonably cooperate, consult with, and provide to such persons all such information as

may be reasonably requested.

24.     <u>Prohibited Use of DIP Facility, Collateral, Carve-Out, Etc.</u>  Without the prior

written consent of the DIP Lenders, the DIP Facility and the Collateral may not be used:

> a.      for the payment of interest and principal with respect to the prepetition
> indebtedness of the Borrower except for: (i) the Carve-Out; (ii) prepetition
> employee wages, benefits and related employee taxes as of the Petition
> Date; (iii) prepetition sales, use and real property taxes; (iv) prepetition
> amounts due in respect of insurance financings, premiums and brokerage
> fees; (v) payment of fees and expenses (including fees and expenses of
> professionals) of the DIP Lender, and subject to the limitations set forth in
> the Approved Budget; (vi) other "first day" interim and final orders
> permitting payment of prepetition claims; (vii) cure amounts reasonably
> acceptable to the DIP Lenders under leases and executory contracts
> assumed with approval of the Court; and (viii) other Prepetition
> Indebtedness to the extent authorized by the Court and set forth in the
> Approved Budget;
>
> b.      subject to this Interim Order (or Final Order, when applicable) in
> connection with or to finance in any way any action, suit, arbitration,
> proceeding, application, motion or other litigation of any type adverse to
> the rights, remedies, claims or defenses of DIP Lenders under the DIP
> Term Sheet, this Interim Order (or, when applicable, the Final Order)
> including preventing, hindering or otherwise delaying the exercise of any
> rights, remedies, claims or defenses by the DIP Lenders under the DIP
> Term Sheet, this Interim Order (or, when applicable, the Final Order) the
> purpose of which is to seek, or the result of which would be to obtain, any
> order, judgment determination, declaration or similar relief (A)
> invalidating, setting aside, avoiding or subordinating, in whole or in part,

the obligations of the DIP Facility or DIP Liens; (B) for monetary, injunctive or other affirmative relief against the DIP Lenders or the Collateral; or (C) preventing, hindering or otherwise delaying the exercise by the DIP Lenders of any rights and remedies under this Interim Order or the Final Order, the DIP Facility Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lenders upon any of their respective collateral;

c.      to make any distribution under a plan of reorganization in any Case;

d.      to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, without prior written consent of the DIP Lenders, unless otherwise set forth in the Approved Budget, or unless otherwise ordered by the Court;

e.      to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests of the Debtor (including so-called "Topping Fees," "Exit Fees" and other similar amounts) without prior written consent by the DIP Lenders, unless otherwise set forth in accordance with the Approved Budget;

f.      to object to, contest, or interfere with, in any way, the DIP Lenders' enforcement or realization upon any of the Collateral once a Termination Event has occurred, except as provided for in this Interim Order or the Final Order, or seek to prevent the DIP Lenders from credit bidding in connection with any proposed plan of reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code;

g.      to use or seek to use any insurance or tax refund proceeds constituting Collateral other than solely in accordance with the Approved Budget and the DIP Facility Documents;

h.      to incur indebtedness other than in accordance with the Approved Budget or the DIP Facility Documents without the prior consent of the DIP Lenders;

i.      to object to or challenge in any way the claims, liens, or interests held by or on behalf of the DIP Lenders;

j.      to assert, commence, prosecute or support any claims or causes of action whatsoever, including, without limitation, any Avoidance Action, against the DIP Lenders;

k.      to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of, or seek equitable relief from, any of the obligations under the DIP Facility, the DIP Liens, or any other rights or interests of the DIP Lenders;

22

l.     to sell or otherwise dispose of the Collateral other than as contemplated by the DIP Term Sheet; or

m.    for any purpose otherwise limited by the DIP Term Sheet.

25.    <u>Reserved</u>.

26.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

27.    <u>Reserved</u>.

28.    <u>Reserved.</u>

29.    <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order, the DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

30.    <u>Discharge Waiver</u>.  The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the obligations under the DIP Facility or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization or liquidation, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the obligations under the DIP Facility have been paid in full in cash on or before the effective date of a confirmed plan of reorganization or liquidation.  Except as otherwise agreed to by the DIP Lenders, the Debtor shall not propose or support any plan or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full, in cash of all obligations under the DIP Facility.

31.    <u>Rights Preserved</u>.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lenders are preserved.

23

32.    <u>Release.</u>  Subject to the entry of the Final Order, the Debtor, on behalf of itself and its estate (including any successor trustee or other estate representative in the Case or any Successor Case) and any party acting by, through, the Debtor or its estate, hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the DIP Agent and the DIP Lenders, and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns and predecessors in interest (collectively, and in each case in their capacities as such, the "**Released Parties**"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Term Sheet, the Facility Documents, or the transactions and relationships contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent and the DIP Lenders, and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority,

enforceability, and nonavoidability of the obligations under the DIP Facility and the DIP Liens. For the avoidance of doubt, the foregoing release shall not constitute a release of any rights arising under the DIP Term Sheet or the DIP Facility Documents.

33.     No Waiver by Failure to Seek Relief.  The failure or delay of the DIP Lenders or the DIP Agent to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Facility Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lenders or the DIP Agent.

34.     Binding Effect of Interim Order.   Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary) and Closing, the terms and provisions of this Interim Order, including the liens granted herein shall, *nunc pro tunc* to the Petition Date, become valid and binding upon and inure to the benefit of the Debtor, the DIP Lenders, all other creditors of the Debtor, any Statutory Committee or any other court appointed committee appointed in the Case, the U.S. Trustee and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or any Successor Case.

35.     No Modification of Interim Order.  The Debtor irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Case or any Successor Case, equal or superior to the DIP Claims; and

(b) without the prior written consent of the DIP Lenders, any lien on any of the Collateral with priority equal or superior to the DIP Lien.  The Debtor irrevocably waives any right to seek any material amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of DIP Lenders.

36.    _Interim Order Controls_.  This Interim Order shall constitute this Court's findings of fact and conclusions of law based upon the record of the Case at the Interim Hearing and shall upon its entry by this Court take effect and be fully enforceable _nunc pro tunc_ to the Petition Date.  There shall be no stay of execution or effectiveness of this Interim Order, notwithstanding anything to the contrary in the Bankruptcy Rules or other applicable law; any applicable stay is hereby waived.  In the event of any inconsistency between the terms and conditions of the DIP Term Sheet, the DIP Facility Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

37.    _Survival_.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Case; (b) converting the Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which the Court abstains from hearing the Case or any Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Case, and shall maintain their priority as provided by this Interim Order until all obligations under the DIP Facility have been paid in full.

26

38.     <u>Cooperation Among the Parties.</u>  Except in the event not reasonably practicable, the Debtor shall provide copies of all substantive motions, applications, other pleadings, and proposed forms of order with respect thereto (all of which shall be in form and substance reasonably acceptable to the DIP Lenders) to the DIP Lenders prior to the filing of any such substantive motions, applications, other pleadings, and proposed forms of order with respect thereto with the Court.

39.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Except as expressly provided herein or in the DIP Term Sheet, no claim or lien having a priority senior to or *pari passu* with that granted by this Interim Order to the DIP Lenders shall be granted while any portion of the obligations under the DIP Facility remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all obligations under the DIP Facility shall have been indefeasibly paid in full, the Debtor shall not seek, and it shall constitute an Event of Default under the DIP Term Sheet, if the Debtor seeks, or if there is entered (i) any stay, vacatur, rescission or modification of this Interim Order or the Final Order without the prior written consent of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lenders, (ii) an order converting the Case to a case under chapter 7 of the Bankruptcy Code or dismissing any of these Case, or (iii) unless otherwise approved by the DIP Lenders, an order granting a change of venue with respect to the Case or any related adversary proceeding.  If an order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any

RLF1 20729430v.2

time entered, (x) the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations under the DIP Facility shall have been paid and satisfied in full and shall, notwithstanding such dismissal, remain binding on all parties in interest, and (y) this Court shall retain jurisdiction, to the extent it has jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any obligations under the DIP Facility incurred prior to the actual receipt of written notice by the DIP Lenders, as applicable, of the effective date of such reversal, stay, modification or vacatur, or (ii) the validity, priority, or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of Collateral or any obligations under the DIP Facility incurred by the Debtor to the DIP Lenders prior to the actual receipt of written notice by the DIP Lenders of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Term Sheet and the DIP Facility Documents with respect to all such uses of the Collateral and all obligations under the DIP Facility.

(d)     Nothing contained in this Interim Order shall limit the Debtor's fiduciary duties.

40.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and approval of the DIP Facility on a final basis is scheduled for _____, 2019 at _____.

(ET) before the Honorable _____, United States Bankruptcy Judge, Courtroom __, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.

41.    <u>Notice of Final Hearing</u>:  Within three (3) Business Days of the date of the entry of this Interim Order, the Debtor shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon: (i) the U.S. Trustee; (ii) the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors; (v) the DIP Lenders; (vi) counsel to the DIP Lenders; (vii) financial institutions where the Debtor holds bank accounts; (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002; (ix) Automotive Rentals, Inc. and (x) proposed counsel for any Statutory Committee.

42.    <u>Objection Deadline</u>:  Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Court, and personally served upon:  (a) proposed counsel to the Debtor, (b) the U.S. Trustee; (c) proposed counsel to any Statutory Committee; and (d) counsel to the DIP Lenders, so that such objections are filed with the Court and received by said parties on or before __:___ p.m. prevailing Eastern Time on _____, 2019 with respect to entry of the Final Order.

43.    <u>Retention of Jurisdiction</u>.   The Court shall retain jurisdiction to enforce this Interim Order according to its terms to the fullest extent permitted by applicable law.

Dated: _____, 2019
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

<u>Exhibit 1</u>

DIP Term Sheet

**CONSOLIDATED INFRASTRUCTURE GROUP, INC.**
**$3 Million Senior Secured Debtor-in-Possession Term Loan Facility**
<u>**Summary of Terms and Conditions**</u>

THIS SUMMARY OF TERMS AND CONDITIONS (THE "**TERM SHEET**") DOES NOT CONSTITUTE A LEGALLY BINDING OBLIGATION OR COMMITMENT, UNLESS AND UNTIL IT IS FULLY EXECUTED AND DELIVERED BY ALL PARTIES HERETO AND ALL CONDITIONS PRECEDENT SET FORTH BELOW HAVE BEEN SATISFIED OR WAIVED.

*This terms outlined below in this Term Sheet are the terms and conditions for a senior secured debtor-in-possession credit facility to be made available to Consolidated Infrastructure Group, Inc. This Term Sheet; a credit agreement containing substantially the terms and subject to the conditions set forth in the Term Sheet, if any; the Interim Order (defined herein); and the Final Order (defined herein) shall collectively constitute the exclusive and definitive documentation and agreement among the parties (the "**DIP Financing Documents**").*

_____

| | |
|---|---|
| **Borrower:** | Consolidated Infrastructure Group, Inc. ("**CIG**" or the "**Borrower**"), as a debtor and debtor in possession in a proceeding (the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of commencement of the Bankruptcy Case will be referred to herein as the "**Petition Date.**" Upon commencement of the Bankruptcy Case, the Borrower will be referred to as the "**Debtor**." |
| **DIP Administrative Agent:** | Parallel49 Equity U.S. Management (Fund V), Inc., in its capacity as administrative agent and collateral agent (in such capacity, the "**DIP Agent**") under the facility governing the DIP Loans (the "**DIP Facility**"). |
| **Lenders:** | Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership; and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership (the "**Lenders**," and each a "**Lender**"). |
| **Backstop Party:** | Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership; and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership. |
| **DIP Facility:** | A maximum amount of $3 million in the aggregate of DIP Loans and other financial accommodations, as follows:<br><br>A senior secured non-amortizing U.S. dollar denominated term loan facility in an aggregate principal amount of up to of $3 million (the "**DIP Facility**," and the loans made thereunder, the "**DIP Loans**") consisting of new money commitments. The DIP Loans may be drawn in multiple installments, with up to $1 million of DIP Loans available upon entry of the Interim Order (as defined below) and shall be subject to the Approved Budget (as defined below). |

| | |
|---|---|
| **Availability of Initial DIP Loans:** | Pursuant to the "Conditions Precedent to the Initial Extension of Credit" set forth below, the Lenders may make loans to the Borrower (the "**Initial DIP Loan**") in an aggregate principal amount not to exceed $3 million. |
| **Security and Priority:** | The obligations of the Borrower under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times pursuant to 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on the Collateral of the Debtor including the proceeds of any claims and causes of action under section 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, "**Avoidance Actions**") (it being understood that such lien on the proceeds of Avoidance Actions shall attach upon entry of the Final Order). |

The liens described above shall be effective and perfected upon entry of the Interim Order, unless otherwise set forth above.

"**Collateral**" means all unencumbered assets and property of the Borrower currently owned or hereafter acquired and each of the Loan Parties, as applicable, including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type.

| | |
|---|---|
| **Carve-Out:** | The "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtor or the official committee of unsecured creditors appointed in the Bankruptcy Case (the "**Creditors' Committee**"), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery to the Borrower of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, the Interim Order or Final Order; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtor, the Debtor's counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $300,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. |

2

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Lenders; (b) attempts to modify any of the rights granted to the Lenders; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' assertion, enforcement or realization upon any Collateral in accordance with the DIP Facility Documents; (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, and the superpriority claims, and any and all other liens or claims securing the DIP Facility.

**Purpose/Use of Proceeds:**

Amounts that may be made available under the DIP Facility shall be used by the Borrower to fund costs of administering the Bankruptcy Case and for general working capital, provided that such amounts shall only be funded by the Lenders and allocated and spent by the Borrower in accordance with the Approved Budget.

**Approved Budget and Reporting Compliance:**

An initial budget through the period ending April 29, 2019 shall be prepared by the Borrower and approved by the Lenders (once so approved, and subject to any update as may be approved by the Lenders, the "**Approved Budget**"). The Approved Budget shall be updated by the Borrower from time to time. The Borrower shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility, subject to the permitted variance approved by the DIP Lenders in their sole discretion.

The Borrower shall provide a budget variance report/reconciliation (the "**Budget Variance Report**") by 12:00 p.m. prevailing Central Time on Wednesday of each week for the week most recently ended (i) showing by line item actual cash receipts, disbursements, Company professional fees, capital expenditures and billings for the immediately preceding week, the immediately preceding rolling four week cumulative period on and after the Closing Date, noting therein all variance, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variance for such week, and (ii) certified by a responsible officer of the Borrower.

**Interest:**

The outstanding DIP Loans and other obligations under the DIP Facility shall bear interest at a fixed rate equivalent to LIBOR plus 9.00% *per annum*, which fixed rate shall be determined as of the Closing Date.

"**LIBOR**" means the London interbank offered rate, which in no event will be less than 1.50% *per annum*.

3

| | |
|---|---|
| **Default Interest:** | Upon the occurrence of and during the continuance of an event of default, the DIP Loans will bear interest at an additional 1.00% *per annum*. |

**Mandatory Prepayments**:  Mandatory prepayment of the DIP Loans shall be required with (a) 100% of the net cash proceeds received for the incurrence of indebtedness not permitted by the express written consent of the DIP Lenders in their sole discretion and (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any Collateral (excluding the sale of inventory in the ordinary course of business and subject to other exceptions to be agreed upon).

**Optional Prepayments**  The Borrower may, upon at least one (1) business day notice, prepay in full or in part, without premium or penalty, repay the DIP Loans.

**Maturity:**  The DIP Facility shall mature upon the "**Termination Date**," which, with respect to the DIP Facility, shall be the earliest of (a) the date that is nine months after the Petition Date, (b) 45 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such period, (c) the consummation of a sale of substantially all of the assets of the Debtors, (d) the substantial consummation of a plan of reorganization or a plan of liquidation filed in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to such DIP Facility in accordance with the DIP Term Sheet.

**Conditions Precedent to the Initial Extension of Credit:**  The initial extension of credit (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") under each of the DIP Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent among others (and the conditions set forth under "*Conditions Precedent to Each Loan*" below):

(i)   The Petition Date shall have occurred, and the Borrower shall be a debtor and a debtor-in-possession. The Interim Order and all other "first day orders" shall be in form and substance satisfactory to the Lenders.

(ii)   Not later than 10 business days following the Petition Date (or such later date as the Lenders may agree), the Lenders shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Lenders (the "**Interim Order**"), authorizing and approving the making of the DIP Loans in the amounts consistent with those set forth in the "DIP Facility" section above, and the granting of the claims and liens and other liens referred to above under the heading "*Security and Priority*", which Interim Order shall not have been vacated, reversed, modified, amended or stayed.

(iii) No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case.

4

| | |
|---|---|
| **Conditions Precedent to Each Loan:** | On the funding date of each DIP Loan after the initial extension of credit, (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the Term Sheet; (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance; (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (iv) the making of such DIP Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable; (v) termination statements with respect to the UCC financing statements filed by Citibank, N.A., Fidus Investment Corporation and CIBC Bank USA of shall have been filed with the Delaware Department of State and delivered to the DIP Lenders; and (vi) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect. |
| **Representation and Warranties:** | The DIP Facility Documents shall contain representations and warranties that are usual and customary for facilities of this type, subject to the approval of the Lenders in their sole discretion, including, but not limited, to the following: (i) financial condition, (ii) no change, (iii) corporate existence, (iv) compliance with law, (v) power, (vi) authorization, (vii) enforceable obligations, (viii) no legal bar, (ix) litigation, (x) no default, (xi) ownership of property, (xii) liens, (xiii) insurance, (xiv) intellectual property, (xv) taxes, (xvi) federal regulations, (xvii) labor matters, (xviii) ERISA, (xix) Investment Company Act, (xx) other regulations, (xxi) subsidiaries, (xxii) use of proceeds, (xxiii) environmental matters, (xxiv) accuracy of information, etc., (xxv) security documents, (xxvi) senior indebtedness, (xxvii) Regulation H, (xxviii) Corporation status, (xxix) anti-terrorism law, and (xxx) Foreign Corrupt Practices Act. |
| **Case Milestones:** | The Term Sheet shall require compliance with the following milestones in accordance with the applicable timing referred to below (or such later dates as approved by the Lenders): |

    (i)     Not later than a date that is 60 days following the Petition Date, the Debtor shall file with the Bankruptcy Court, a motion to approve bidding procedures with respect to a sale of all or substantially all of the Debtor's assets, which motion shall be reasonably satisfactory to the Lenders.

    (ii)    Not later than a date that is 90 days following the Petition Date, the Bankruptcy Court shall enter an order approving the proposed bidding procedures, which bidding procedures shall be reasonably satisfactory to the Lenders.

    (iii)   Not later than a date that is 120 days following the Petition Date, the Debtor shall consummate the sale of all or substantially all of its assets

(iv)  Not later than a date that is 150 days following the Petition Date, the Debtor shall file with the Bankruptcy Court a plan of reorganization or a plan of liquidation and a disclosure statement, which plan and disclosure statement shall be reasonably satisfactory to the Lenders in their sole discretion.

(v)   Not later than a date that is 180 days following the Petition Date, the Bankruptcy Court shall enter an order approving the disclosure statement, which disclosure statement shall be reasonably satisfactory to the Lenders in their sole discretion.

(vi)  Not later than a date that is 210 days following the Petition Date, the Bankruptcy Court shall enter an order confirming a plan of reorganization or a plan of liquidation, which plan shall be reasonably satisfactory to the Lenders in their sole discretion.

(vii) Not later than a date that is 270 days following the Petition Date, such plan of reorganization or a plan of liquidation, which plan shall be reasonably satisfactory to the Lenders in their sole discretion, shall become effective.

| | |
|---|---|
| **Negative Covenants:** | The DIP Facility Documents shall contain negative covenants usual and customary for facilities of this type, to be applicable to the Borrower and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Facility Documents, subject to the approval of the Lenders in their sole discretion, which include, but not be limited to, the following: (i) limitations on indebtedness, (ii) limitations on liens, (iii) limitations on fundamental changes, (iv) limitations on dispositions of property, (v) limitations on restricted payments, (vi) limitations on investments, (vii) limitations on prepayments and modifications of certain debt instruments or organization documents, (viii) limitations on transactions with affiliates, (ix) limitations on changes in fiscal periods and accounting changes, (x) limitations on negative pledge clauses, (xi) limitations on clauses restricting subsidiary distributions, (xii) limitations on lines of business, (xiii) limitations on material agreements, (xiv) limitations on capital expenditures, (xv) limitations on sale and leaseback transactions, (xvi) limitations on locations of collateral, and (xvii) certain bankruptcy matters. |
| **Affirmative Covenants:** | The DIP Facility Documents shall contain affirmative covenants usual and customary for facilities of this type, to be applicable to the Borrower and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Facility Documents, subject to the approval of the Lenders in their sole discretion, which shall include, but not be limited to, the following:  (i) financial statements, (ii) certificates; other information, (iii) payment of obligations, (iv) maintenance of existence; compliance, (v) maintenance of property; insurance, (vi) inspection of property; books and records; discussion, (vii) notices, (viii) environmental laws, (ix) additional collateral, etc., (x) security interests; further assurances, (xi) ERISA, (xii) use of proceeds, and (xiii) certain bankruptcy matters. |

**Financial Covenants**:    The DIP Facility Documents shall contain financial covenants to be mutually agreed upon, subject to the approval of the Lenders in their sole discretion.

**Events of Default:**    The DIP Facility Documents shall contain events of default, and where appropriate, grace periods and exceptions, which events of default (the "**Events of Default**") shall include, but not be limited to, the following: (i) failure to pay principal or interest at the Termination Date or as set forth in the DIP Facility Documents; (ii) breaches of representations and warranties; (iii) failure to comply with covenants; (iv) postpetition judgments subject to carve-outs; (v) actual or asserted invalidity or impairment of any DIP Facility Documents (including the failure of any lien to remain perfected); (vi) change of ownership or control; (vii) failure of subordination; (viii) the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or the filing by the Borrower of a motion or other pleading seeking entry of such order; (ix) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Bankruptcy Case, the Borrower applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Lenders in their sole discretion; (x) the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent or the Lenders, or the filing by the Borrower of an application, motion or other pleading seeking entry of such an order; (xi) the entry of an order in the Bankruptcy Case granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Borrower in excess of an amount to be mutually agreed; (xii) the entry of a final non-appealable order in the Bankruptcy Case charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Borrower (or any direct or indirect parent thereof) that challenges the rights and remedies of the Administrative Agent or the Lenders under the DIP Facility in the Bankruptcy Case or that is inconsistent with the DIP Facility Documents; (xiii) without the consent of the Lenders, the entry of an order in the Bankruptcy Case seeking authority to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; (xiv) termination or expiration of any exclusivity period for the Borrower to file or solicit acceptances for a plan of reorganization or a plan of liquidation; (xv) the filing or support of any pleading by the Borrower, seeking, or otherwise consenting to, any of the matters set forth in clauses (viii) through (xiv) above; (xvi) the entry of the Final Order shall not have occurred within 45 days after the entry of the Interim Order (or such later date as the Lenders may reasonably agree); (xvi) except with the consent of the Lenders, an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code or senior secured status pursuant to section 364(c)(2) of the Bankruptcy Code senior to or *pari passu* with the claims of the Lenders under the DIP Facility; and (xvii) a plan of reorganization or a plan of

liquidation shall be confirmed in the Bankruptcy Case that is not acceptable to the Lenders or any order shall be entered to dismiss the Bankruptcy Case and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Borrower's obligations under the DIP Facility and that is not otherwise reasonably satisfactory to the Lenders, or the Borrower shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

Notwithstanding anything to the contrary contained herein, any Event of Default under the Term Sheet shall be deemed not to be continuing if the events, acts or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of action or omitted to take any action) or have ceased to exist.

Upon the occurrence of an Event of Default, the Lenders may (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower, and (iii) the termination of the DIP Facility Documents as to any future liability or obligation of the Lenders, but without affecting any of the liens or the obligations under the DIP Facility and (y) upon the giving of 5 calendar days' notice to the Borrower (the "**Remedies Notice Period**"), exercise all other rights and remedies provided for in the DIP Facility Documents and applicable law.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

|  |  |
|---|---|
| **Expenses and Indemnification:** | The Borrower shall pay or reimburse the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of DLA Piper LLP (US)) in connection with (i) the preparation, negotiation and execution of the DIP Facility and the DIP Facility Documents; (ii) the syndication and funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Facility Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Facility Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Bankruptcy Case. |

The Borrower shall pay or reimburse the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of DLA Piper LLP (US)) in connection with (i) the enforcement of the DIP Facility Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Facility Documents, including the Bankruptcy Case.

The Borrower will indemnify and hold harmless the Lenders and their respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Facility Documents and Debtor's use of the financing provided thereunder.

The indemnification will survive and continues for the benefit of all such persons or entities.

|  |  |
|---|---|
| **Counsel to the Lenders:** | DLA Piper LLP (US) |
| **Governing Law and Submission to Exclusive Jurisdiction:** | Federal bankruptcy law and the laws of the State of Delaware. |

9

**PARALLEL49 EQUITY U.S. MANAGEMENT (FUND V), INC., AS DIP AGENT**

By:
Name:
Title:

*[Signature Page to DIP Term Sheet]*

**PARALLEL49 EQUITY (FUND V), LIMITED PARTNERSHIP**

By: Parallel49 Equity GP (Fund V), Limited Partnership
Its: General Partner

By: Parallel49 Equity UGP (Fund V), Inc.
Its: General Partner

**By:** _____
**Name:** Scott Daum
**Title:** Managing Director

*[Signature Page to DIP Term Sheet]*

**PARALLEL49 EQUITY (FUND V) BC, LIMITED PARTNERSHIP**

By: Parallel49 Equity GP (Fund V), Limited Partnership
Its: General Partner

By: Parallel49 Equity UGP (Fund V), Inc.
Its: General Partner

**By:** _____

**Name:** Scott Daum
**Title:** Managing Director

*[Signature Page to DIP Term Sheet]*

Exhibit 2

Approved Budget

RLF1 20729430v.2

CIG, Inc.
13 week DIP Financing Budget

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week of: | 1/28/2019 | 2/4/2019 | 2/11/2019 | 2/18/2019 | 2/25/2019 | 3/4/2019 | 3/11/2019 | 3/18/2019 | 3/25/2019 | 4/1/2019 | 4/8/2019 | 4/15/2019 | 4/22/2019 |
| Beginning Cash Balance | $ 62,400 | $ 5,900 | $ 402,039 | $ 333,167 | $ 283,513 | $ 253,179 | $ 563,473 | $ 665,673 | $ 654,921 | $ 632,587 | $ 208,719 | $ 348,819 | $ 1,037,313 |
| Inflows | - | 29,505 | 221,445 | 152,651 | 16,666 | - | 192,200 | 220,319 | 16,666 | - | 170,100 | 202,494 | 16,666 |
| Outflows | (56,500) | (633,366) | (290,317) | (202,305) | (47,000) | (689,706) | (90,000) | (231,071) | (39,000) | (423,868) | (30,000) | (514,000) | (81,082) |
| Borrowings | - | 1,000,000 | | | | 1,000,000 | | | | | | 1,000,000 | |
| Ending Cash Balance | $ 5,900 | $ 402,039 | $ 333,167 | $ 283,513 | $ 253,179 | $ 563,473 | $ 665,673 | $ 654,921 | $ 632,587 | $ 208,719 | $ 348,819 | $ 1,037,313 | $ 972,897 |

**Inflows:**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| City of Davenport | | | | | 16,666 | | | | 16,666 | | | | 16,666 |
| NIPSCO | | | | 140,651 | | | | 216,319 | | | | 198,494 | |
| OneGas W&P | | | 146,445 | | | | 192,200 | | | | 170,100 | | |
| Pioneer (Oct Inv) | | 29,505 | | | | | | | | | | | |
| Wells Fargo - return of CC deposit | | | 75,000 | | | | | | | | | | |
| KGP, Co | | | | 12,000 | | | | 4,000 | | | | 4,000 | |
| Other | | | | | | | | | | | | | |
| | - | 29,505 | 221,445 | 152,651 | 16,666 | - | 192,200 | 220,319 | 16,666 | - | 170,100 | 202,494 | 16,666 |

**Outflows:**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | 10,000 | 140,000 | | 150,000 | | 160,000 | | 170,000 | | 180,000 | | 210,000 | |
| NWC seasonal ramp-up | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | |
| ERP Insurance | - | - | 258,817 | | | 123,435 | | | | 123,435 | | | |
| Workers Comp Insurance | 15,000 | | | | 8,000 | | | | 8,000 | | | | |
| Fuel | 7,500 | 5,000 | 7,500 | 5,000 | 5,000 | 6,000 | 5,000 | 7,000 | 6,000 | 8,000 | 9,000 | 8,000 | 9,000 |
| Field Supplies | 10,000 | 46,220 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 10,000 | 5,000 | 10,000 | 5,000 |
| Employee Benefits | | 19,426 | | | | 18,551 | | | | 23,213 | | | |
| Vehicle leases | - | 96,220 | | | | 41,720 | | | | 43,220 | | | |
| Communcations | | | | 23,305 | | | | 24,071 | | | | | 21,082 |
| Damages | | 10,000 | | | | 10,000 | | | | 10,000 | | | |
| Vehicle R&M | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Travel/Exp Reports | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Restructuring Fees | - | 300,000 | - | - | 5,000 | 300,000 | 55,000 | - | - | - | - | 270,000 | 30,000 |
| Ordinary Course Professionals | | 2,500 | | | | | | | | 5,000 | | | |
| Other | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| | 56,500 | 633,366 | 290,317 | 202,305 | 47,000 | 689,706 | 90,000 | 231,071 | 39,000 | 423,868 | 30,000 | 514,000 | 81,082 |

**EXHIBIT B**

**(DIP Term Sheet)**

**CONSOLIDATED INFRASTRUCTURE GROUP, INC.**
**$3 Million Senior Secured Debtor-in-Possession Term Loan Facility**
<u>**Summary of Terms and Conditions**</u>

THIS SUMMARY OF TERMS AND CONDITIONS (THE "**TERM SHEET**") DOES NOT CONSTITUTE A LEGALLY BINDING OBLIGATION OR COMMITMENT, UNLESS AND UNTIL IT IS FULLY EXECUTED AND DELIVERED BY ALL PARTIES HERETO AND ALL CONDITIONS PRECEDENT SET FORTH BELOW HAVE BEEN SATISFIED OR WAIVED.

*This terms outlined below in this Term Sheet are the terms and conditions for a senior secured debtor-in-possession credit facility to be made available to Consolidated Infrastructure Group, Inc. This Term Sheet; a credit agreement containing substantially the terms and subject to the conditions set forth in the Term Sheet, if any; the Interim Order (defined herein); and the Final Order (defined herein) shall collectively constitute the exclusive and definitive documentation and agreement among the parties (the "**DIP Financing Documents**").*

---

| | |
|---|---|
| **Borrower:** | Consolidated Infrastructure Group, Inc. ("**CIG**" or the "**Borrower**"), as a debtor and debtor in possession in a proceeding (the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of commencement of the Bankruptcy Case will be referred to herein as the "**Petition Date.**" Upon commencement of the Bankruptcy Case, the Borrower will be referred to as the "**Debtor.**" |
| **DIP Administrative Agent:** | Parallel49 Equity U.S. Management (Fund V), Inc., in its capacity as administrative agent and collateral agent (in such capacity, the "**DIP Agent**") under the facility governing the DIP Loans (the "**DIP Facility**"). |
| **Lenders:** | Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership; and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership (the "**Lenders**," and each a "**Lender**"). |
| **Backstop Party:** | Parallel49 Equity (Fund V), Limited Partnership, a Delaware limited partnership; and Parallel49 Equity (Fund V) BC, Limited Partnership, a British Columbia limited partnership. |
| **DIP Facility:** | A maximum amount of $3 million in the aggregate of DIP Loans and other financial accommodations, as follows:<br><br>A senior secured non-amortizing U.S. dollar denominated term loan facility in an aggregate principal amount of up to of $3 million (the "**DIP Facility**," and the loans made thereunder, the "**DIP Loans**") consisting of new money commitments. The DIP Loans may be drawn in multiple installments, with up to $1 million of DIP Loans available upon entry of the Interim Order (as defined below) and shall be subject to the Approved Budget (as defined below). |

| | |
|---|---|
| **Availability of Initial DIP Loans:** | Pursuant to the "Conditions Precedent to the Initial Extension of Credit" set forth below, the Lenders may make loans to the Borrower (the "**Initial DIP Loan**") in an aggregate principal amount not to exceed $3 million. |
| **Security and Priority:** | The obligations of the Borrower under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times pursuant to 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on the Collateral of the Debtor including the proceeds of any claims and causes of action under section 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, "**Avoidance Actions**") (it being understood that such lien on the proceeds of Avoidance Actions shall attach upon entry of the Final Order). |
| | The liens described above shall be effective and perfected upon entry of the Interim Order, unless otherwise set forth above. |
| | "**Collateral**" means all unencumbered assets and property of the Borrower currently owned or hereafter acquired and each of the Loan Parties, as applicable, including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type. |
| **Carve-Out:** | The "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtor or the official committee of unsecured creditors appointed in the Bankruptcy Case (the "**Creditors' Committee**"), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before delivery to the Borrower of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, the Interim Order or Final Order; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtor, the Debtor's counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $300,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. |

2

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Lenders; (b) attempts to modify any of the rights granted to the Lenders; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' assertion, enforcement or realization upon any Collateral in accordance with the DIP Facility Documents; (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, and the superpriority claims, and any and all other liens or claims securing the DIP Facility.

|  |  |
|---|---|
| **Purpose/Use of Proceeds:** | Amounts that may be made available under the DIP Facility shall be used by the Borrower to fund costs of administering the Bankruptcy Case and for general working capital, provided that such amounts shall only be funded by the Lenders and allocated and spent by the Borrower in accordance with the Approved Budget. |
| **Approved Budget and Reporting Compliance:** | An initial budget through the period ending April 29, 2019 shall be prepared by the Borrower and approved by the Lenders (once so approved, and subject to any update as may be approved by the Lenders, the "**Approved Budget**"). The Approved Budget shall be updated by the Borrower from time to time. The Borrower shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility, subject to the permitted variance approved by the DIP Lenders in their sole discretion. |
|  | The Borrower shall provide a budget variance report/reconciliation (the "**Budget Variance Report**") by 12:00 p.m. prevailing Central Time on Wednesday of each week for the week most recently ended (i) showing by line item actual cash receipts, disbursements, Company professional fees, capital expenditures and billings for the immediately preceding week, the immediately preceding rolling four week cumulative period on and after the Closing Date, noting therein all variance, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variance for such week, and (ii) certified by a responsible officer of the Borrower. |
| **Interest:** | The outstanding DIP Loans and other obligations under the DIP Facility shall bear interest at a fixed rate equivalent to LIBOR plus 9.00% *per annum*, which fixed rate shall be determined as of the Closing Date. |
|  | "**LIBOR**" means the London interbank offered rate, which in no event will be less than 1.50% *per annum*. |

| | |
|---|---|
| **Default Interest:** | Upon the occurrence of and during the continuance of an event of default, the DIP Loans will bear interest at an additional 1.00% *per annum*. |
| **Mandatory Prepayments**: | Mandatory prepayment of the DIP Loans shall be required with (a) 100% of the net cash proceeds received for the incurrence of indebtedness not permitted by the express written consent of the DIP Lenders in their sole discretion and (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any Collateral (excluding the sale of inventory in the ordinary course of business and subject to other exceptions to be agreed upon). |
| **Optional Prepayments** | The Borrower may, upon at least one (1) business day notice, prepay in full or in part, without premium or penalty, repay the DIP Loans. |
| **Maturity:** | The DIP Facility shall mature upon the "**Termination Date**," which, with respect to the DIP Facility, shall be the earliest of (a) the date that is nine months after the Petition Date, (b) 45 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such period, (c) the consummation of a sale of substantially all of the assets of the Debtors, (d) the substantial consummation of a plan of reorganization or a plan of liquidation filed in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to such DIP Facility in accordance with the DIP Term Sheet. |
| **Conditions Precedent to the Initial Extension of Credit:** | The initial extension of credit (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") under each of the DIP Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent among others (and the conditions set forth under "*Conditions Precedent to Each Loan*" below): |

    (i)   The Petition Date shall have occurred, and the Borrower shall be a debtor and a debtor-in-possession. The Interim Order and all other "first day orders" shall be in form and substance satisfactory to the Lenders.

    (ii)  Not later than 10 business days following the Petition Date (or such later date as the Lenders may agree), the Lenders shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Lenders (the "**Interim Order**"), authorizing and approving the making of the DIP Loans in the amounts consistent with those set forth in the "DIP Facility" section above, and the granting of the claims and liens and other liens referred to above under the heading "*Security and Priority*", which Interim Order shall not have been vacated, reversed, modified, amended or stayed.

    (iii) No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case.

EAST\164280666.9

**Conditions Precedent to Each Loan:** On the funding date of each DIP Loan after the initial extension of credit, (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the Term Sheet; (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance; (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (iv) the making of such DIP Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable; (v) termination statements with respect to the UCC financing statements filed by Citibank, N.A., Fidus Investment Corporation and CIBC Bank USA of shall have been filed with the Delaware Department of State and delivered to the DIP Lenders; and (vi) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect.

**Representation and Warranties:** The DIP Facility Documents shall contain representations and warranties that are usual and customary for facilities of this type, subject to the approval of the Lenders in their sole discretion, including, but not limited, to the following: (i) financial condition, (ii) no change, (iii) corporate existence, (iv) compliance with law, (v) power, (vi) authorization, (vii) enforceable obligations, (viii) no legal bar, (ix) litigation, (x) no default, (xi) ownership of property, (xii) liens, (xiii) insurance, (xiv) intellectual property, (xv) taxes, (xvi) federal regulations, (xvii) labor matters, (xviii) ERISA, (xix) Investment Company Act, (xx) other regulations, (xxi) subsidiaries, (xxii) use of proceeds, (xxiii) environmental matters, (xxiv) accuracy of information, etc., (xxv) security documents, (xxvi) senior indebtedness, (xxvii) Regulation H, (xxviii) Corporation status, (xxix) anti-terrorism law, and (xxx) Foreign Corrupt Practices Act.

**Case Milestones:** The Term Sheet shall require compliance with the following milestones in accordance with the applicable timing referred to below (or such later dates as approved by the Lenders):

(i)     Not later than a date that is 60 days following the Petition Date, the Debtor shall file with the Bankruptcy Court, a motion to approve bidding procedures with respect to a sale of all or substantially all of the Debtor's assets, which motion shall be reasonably satisfactory to the Lenders.

(ii)    Not later than a date that is 90 days following the Petition Date, the Bankruptcy Court shall enter an order approving the proposed bidding procedures, which bidding procedures shall be reasonably satisfactory to the Lenders.

(iii)   Not later than a date that is 120 days following the Petition Date, the Debtor shall consummate the sale of all or substantially all of its assets

(iv)    Not later than a date that is 150 days following the Petition Date, the Debtor shall file with the Bankruptcy Court a plan of reorganization or a plan of liquidation and a disclosure statement, which plan and disclosure statement shall be reasonably satisfactory to the Lenders in their sole discretion.

(v)    Not later than a date that is 180 days following the Petition Date, the Bankruptcy Court shall enter an order approving the disclosure statement, which disclosure statement shall be reasonably satisfactory to the Lenders in their sole discretion.

(vi)    Not later than a date that is 210 days following the Petition Date, the Bankruptcy Court shall enter an order confirming a plan of reorganization or a plan of liquidation, which plan shall be reasonably satisfactory to the Lenders in their sole discretion.

(vii)    Not later than a date that is 270 days following the Petition Date, such plan of reorganization or a plan of liquidation, which plan shall be reasonably satisfactory to the Lenders in their sole discretion, shall become effective.

| | |
|---|---|
| **Negative Covenants:** | The DIP Facility Documents shall contain negative covenants usual and customary for facilities of this type, to be applicable to the Borrower and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Facility Documents, subject to the approval of the Lenders in their sole discretion, which include, but not be limited to, the following: (i) limitations on indebtedness, (ii) limitations on liens, (iii) limitations on fundamental changes, (iv) limitations on dispositions of property, (v) limitations on restricted payments, (vi) limitations on investments, (vii) limitations on prepayments and modifications of certain debt instruments or organization documents, (viii) limitations on transactions with affiliates, (ix) limitations on changes in fiscal periods and accounting changes, (x) limitations on negative pledge clauses, (xi) limitations on clauses restricting subsidiary distributions, (xii) limitations on lines of business, (xiii) limitations on material agreements, (xiv) limitations on capital expenditures, (xv) limitations on sale and leaseback transactions, (xvi) limitations on locations of collateral, and (xvii) certain bankruptcy matters. |
| **Affirmative Covenants:** | The DIP Facility Documents shall contain affirmative covenants usual and customary for facilities of this type, to be applicable to the Borrower and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Facility Documents, subject to the approval of the Lenders in their sole discretion, which shall include, but not be limited to, the following:  (i) financial statements, (ii) certificates; other information, (iii) payment of obligations, (iv) maintenance of existence; compliance, (v) maintenance of property; insurance, (vi) inspection of property; books and records; discussion, (vii) notices, (viii) environmental laws, (ix) additional collateral, etc., (x) security interests; further assurances, (xi) ERISA, (xii) use of proceeds, and (xiii) certain bankruptcy matters. |

EAST\164280666.9

**Financial
Covenants**:
The DIP Facility Documents shall contain financial covenants to be mutually agreed upon, subject to the approval of the Lenders in their sole discretion.

**Events of Default:**
The DIP Facility Documents shall contain events of default, and where appropriate, grace periods and exceptions, which events of default (the "**Events of Default**") shall include, but not be limited to, the following: (i) failure to pay principal or interest at the Termination Date or as set forth in the DIP Facility Documents; (ii) breaches of representations and warranties; (iii) failure to comply with covenants; (iv) postpetition judgments subject to carve-outs; (v) actual or asserted invalidity or impairment of any DIP Facility Documents (including the failure of any lien to remain perfected); (vi) change of ownership or control; (vii) failure of subordination; (viii) the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or the filing by the Borrower of a motion or other pleading seeking entry of such order; (ix) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Bankruptcy Case, the Borrower applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Lenders in their sole discretion; (x) the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent or the Lenders, or the filing by the Borrower of an application, motion or other pleading seeking entry of such an order; (xi) the entry of an order in the Bankruptcy Case granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Borrower in excess of an amount to be mutually agreed; (xii) the entry of a final non-appealable order in the Bankruptcy Case charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Borrower (or any direct or indirect parent thereof) that challenges the rights and remedies of the Administrative Agent or the Lenders under the DIP Facility in the Bankruptcy Case or that is inconsistent with the DIP Facility Documents; (xiii) without the consent of the Lenders, the entry of an order in the Bankruptcy Case seeking authority to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; (xiv) termination or expiration of any exclusivity period for the Borrower to file or solicit acceptances for a plan of reorganization or a plan of liquidation; (xv) the filing or support of any pleading by the Borrower, seeking, or otherwise consenting to, any of the matters set forth in clauses (viii) through (xiv) above; (xvi) the entry of the Final Order shall not have occurred within 45 days after the entry of the Interim Order (or such later date as the Lenders may reasonably agree); (xvi) except with the consent of the Lenders, an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code or senior secured status pursuant to section 364(c)(2) of the Bankruptcy Code senior to or *pari passu* with the claims of the Lenders under the DIP Facility; and (xvii) a plan of reorganization or a plan of

EAST\164280666.9

liquidation shall be confirmed in the Bankruptcy Case that is not acceptable to the Lenders or any order shall be entered to dismiss the Bankruptcy Case and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Borrower's obligations under the DIP Facility and that is not otherwise reasonably satisfactory to the Lenders, or the Borrower shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

Notwithstanding anything to the contrary contained herein, any Event of Default under the Term Sheet shall be deemed not to be continuing if the events, acts or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of action or omitted to take any action) or have ceased to exist.

Upon the occurrence of an Event of Default, the Lenders may (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower, and (iii) the termination of the DIP Facility Documents as to any future liability or obligation of the Lenders, but without affecting any of the liens or the obligations under the DIP Facility and (y) upon the giving of 5 calendar days' notice to the Borrower (the "**Remedies Notice Period**"), exercise all other rights and remedies provided for in the DIP Facility Documents and applicable law.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

|  |  |
|---|---|
| **Expenses and Indemnification:** | The Borrower shall pay or reimburse the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of DLA Piper LLP (US)) in connection with (i) the preparation, negotiation and execution of the DIP Facility and the DIP Facility Documents; (ii) the syndication and funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Facility Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Facility Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Bankruptcy Case. |

The Borrower shall pay or reimburse the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of DLA Piper LLP (US)) in connection with (i) the enforcement of the DIP Facility Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Facility Documents, including the Bankruptcy Case.

EAST\164280666.9

The Borrower will indemnify and hold harmless the Lenders and their respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Facility Documents and Debtor's use of the financing provided thereunder.

The indemnification will survive and continues for the benefit of all such persons or entities.

**Counsel to the Lenders:**    DLA Piper LLP (US)

**Governing Law and Submission to Exclusive Jurisdiction:**    Federal bankruptcy law and the laws of the State of Delaware.

**PARALLEL49 EQUITY U.S. MANAGEMENT (FUND V), INC., AS DIP AGENT**

By:
Name:
Title:

*[Signature Page to DIP Term Sheet]*

**PARALLEL49 EQUITY (FUND V), LIMITED PARTNERSHIP**

By: Parallel49 Equity GP (Fund V), Limited Partnership
Its: General Partner

By: Parallel49 Equity UGP (Fund V), Inc.
Its: General Partner

**By:** _____

**Name:** Scott Daum
**Title:** Managing Director

*[Signature Page to DIP Term Sheet]*

**PARALLEL49 EQUITY (FUND V) BC, LIMITED PARTNERSHIP**

By: Parallel49 Equity GP (Fund V), Limited Partnership
Its: General Partner

By: Parallel49 Equity UGP (Fund V), Inc.
Its: General Partner

**By:** _____

**Name:** Scott Daum
**Title:** Managing Director

*[Signature Page to DIP Term Sheet]*